53 Cal.Rptr.3d 445 (2007)
146 Cal.App.4th 1126
CALIFORNIA FARM BUREAU FEDERATION et al. Plaintiffs and Appellants,
v.
CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, Defendant and Respondent.
No. C050289.
Court of Appeal of California, Third District.
January 17, 2007.
*447 Gibson, Dunn & Crutcher, David A. Battaglia and Eileen M. Ahern, Los Angeles; Nancy N. McDonough, Sacramento, Carl G. Borden, for Plaintiff and Appellant California Farm Bureau Federation.
Somach, Simmons & Dunn, Stuart L. Somach, Kristen T. Castanos, Robert B. Hoffman and Daniel Kelly, Sacramento, for Plaintiffs and Appellants Northern California Water Association and Central Valley Project Water Association.
Bill Lockyer, Attorney General, David S. Chaney, Senior Assistant Attorney General, William L. Carter, Supervising Deputy Attorney General, Matthew J. Goldman and Molly K. Mosley, Deputy Attorneys General, for Defendants and Respondents.
O'Laughlin & Paris, Tim O'Laughlin and William C. Paris, Chico, for San Joaquin River Group Authority as Amicus Curiae.
Downey Brand, Kevin M. O'Brien, Jennifer L. Harder and Joseph S. Schofield, Sacramento, for Amicus Association of California Water Agencies as Amicus Curiae.
Jason E. Resnick for Western Growers Association, California Cattlemen's Association, and California Grape and Tree Fruit League as Amici Curiae.
*446 CANTIL-SAKAUYE, J.
In this appeal we consider whether the State Water Resources Control Board's *448 (SWRCB) imposition of new annual fees on holders of water right permits and licenses under Water Code section 1525 and implementing emergency regulations constituted lawful regulatory fees or unlawful taxes adopted in violation of article XIIIA of the California Constitution (Proposition 13).[1] Also challenged as unconstitutional are new annual fees imposed on persons and entities that contract for water from the United States Bureau of Reclamation (Bureau) pursuant to Water Code sections 1540 and 1560,[2] and the emergency regulations.
The California Farm Bureau Federation (Farm Bureau), Northern California Water Association (NCWA), Central Valley Project Water Association (CVPWA) and individual fee payers filed this action against the SWRCB for declaratory and injunctive relief, and writ of mandate (Code Civ. Proc, §§ 526, 863, 1060, 1085) after the SWRCB denied their requests for reconsideration and refund of annual fees billed in January 2004. Among other things, plaintiffs seek invalidation of the allegedly unconstitutional statutes, rescission of the emergency regulations, and refund of fees paid.
Applying the independent standard of review in our analysis of the constitutionality of the statutes and emergency regulations, we reject plaintiffs' claim that sections 1525, 1540 and 1560 are facially invalid. We conclude instead that the annual fees are unlawful as applied through the emergency regulations. Accordingly, we shall reverse the judgment in part, and remand with directions regarding the adoption of new fee schedules and refund of the annual fees unlawfully imposed.

FACTUAL AND PROCEDURAL BACKGROUND

A. The Parties

Plaintiff Farm Bureau alleges the state and county farm bureaus, named as plaintiffs in its complaint, are membership organizations authorized to take judicial action to protect the rights of farm families that hold water rights subject to the fees imposed by Senate Bill No. 1049 and the emergency regulations. Farm Bureau alleges the individuals named as plaintiffs in its complaint hold water rights and were assessed the challenged fees.
Plaintiff NCWA alleges it represents over 70 agricultural water districts within the Sacramento River Basin, some of which hold water rights, some of which receive water under contract with the Bureau of Reclamation, and others that operate hydroelectric plants licensed or regulated by the Federal Energy Regulatory Commission (FERC).
The CVPWA alleges it represents "the interests of the 300 agricultural and municipal districts, agencies and communities that are located in the Central Valley ... and the Santa Clara Valley ... that have *449 contracts for water from the federal Central Valley Project (CVP)...." The complaint names in an appendix the persons and entities who paid the annual fees under protest. Both the NCWA and CVPWA allege they are authorized to sue on behalf of their member agencies.
Defendant SWRCB is charged with the "orderly and efficient administration of the water resources of the state. ..." (§ 174.) It exercises both adjudicatory and regulatory functions in connection with water rights. (Ibid.) The water in California's streams and rivers belongs to the people of the state, but individuals may acquire the right to use the water under common and statutory law. (§§ 102, 1201.) The California Constitution sets forth the state policy of reasonable use: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water...." (Cal. Const., art. X, § 2.) Beneficial uses include, but are not limited to "use for domestic, irrigation, municipal, industrial, preservation and enhancement of fish and wildlife, recreational, mining and power purposes ...." (§ 1257; see also Cal.Code Regs., tit. 23, § 659 et seq.)
The SWRCB's Division of Water Rights (the Division) is responsible for administering the water rights program. It issues permits and licenses, and maintains records of the appropriation and use of all waters within the state. The Division nominally oversees post-1914 permitted and licensed water rights, and publicly held water rights. The Division has no statutory authority over riparian, pueblo and pre-1914 appropriative water rights represented by "Statements of Water Diversion & Use" that account for 38 percent of the state's water subject to water rights.[3]

B. The Division

The Division is divided into three sections: permitting, licensing, and hearings and special projects. The permitting section "processes water right applications, petitions to change terms in water right permits and water right licenses. Groundwater recordations, [and] statements of water diversion and use, which are a recordation function...." The licensing section enforces existing permits and licenses and handles work associated with licensing a permit. The hearings and special projects section assists the SWRCB with various types of administrative hearings, reviews environmental documents filed in support of water rights applications and petitions, assists with the implementation of the Bay-Delta Water Quality Control Plan, and certifies water quality in projects licensed by FERC and in diversions under water right permits or licenses.
The resources of the Division are allocated as follows:
(1) Processing applications and petitions25 percent;

*450 (2) Environmental review18 percent;
(3) Bay-Delta Project6 percent;
(4) Licensing and compliance21 percent;
(5) Hearings11 percent;
(6) Overhead19 percent.
The record contains no breakdown of the specific Division services used by each category of water right holders. As we will explain there are at least three types of water rights holders: riparian, pre-1914 appropriative, and post-1914 permit and license holders. However, the SWRCB states that one-third of the Division's work is for the benefit of the general public to protect the public trust and the environment.

C. California Water Rights

Before discussing the specific legal issues raised by the parties, we shall describe the historical development of California water rights. Four types of water rights are relevant to the issues in this appeal.

1. Riparian Rights
Under the common law riparian doctrine, a person owning land bordering a stream has the right to reasonable and beneficial use of water on his or her lands. (People v. Shirokow (1980) 26 Cal.3d 301, 307, 162 Cal.Rptr. 30, 605 P.2d 859 (Shirokow); see also Miller & Lux, Inc. v. Enterprise Canal & Land Co. (1915) 169 Cal. 415, 441-444, 147 P. 567.) A riparian owner must share the right to use water with other riparian owners. (See Harris v. Harrison (1892) 93 Cal. 676, 681, 29 P. 325.) The SWRCB acknowledges that its, "core regulatory program, the administration of water right permits and licenses, does not apply" to holders of riparian water rights. The SWRCB has "[o]nly the authority to take action if the use by a pre-14 or riparian holder is wasteful or unreasonable."[4]

2. Pre-1914 Appropriative Rights
The appropriation doctrine arose under the common law during the California gold rush when miners diverted water from streams to work their placer mining claims. (Shirokow, supra, 26 Cal.3d at p. 308, 162 Cal.Rptr. 30, 605 P.2d 859; see also Irwin v. Phillips (1855) 5 Cal. 140, 145-147.) As between appropriates, the rule was "[the] first in time [is the] first in right." (Shirokow, supra, at p. 308, 162 Cal.Rptr. 30, 605 P.2d 859.) The Legislature enacted the first appropriation statute in 1872 under which a person could establish the appropriative right to water use by posting and recording notice. (Ibid.) Thereafter, for some 40 years, both the common law and statutory methods were used to acquire appropriative water rights. (Ibid.)
Together, riparian and pre-1914 appropriative water rights account for the 38 percent of the water subject to water rights under "Statements of Water Diversion & Use."[5]

3. Post-1914 Permitted and Licensed Rights
The two methods of acquiring appropriative water rights were superseded by the *451 Legislature's enactment of the Water Commission Act in 1913 "to provide an orderly method for the appropriation of [unappropriated] waters." (Temescal Water Co. v. Dept. of Public Works (1955) 44 Cal.2d 90, 95, 280 P.2d 1; Stats.1913, ch. 586, § 45, p. 1033; Shirokow, supra, 26 Cal.3d at p. 308, 162 Cal.Rptr. 30, 605 P.2d 859.) Effective on December 19, 1914 (Shirokow, supra, at p. 309, 162 Cal.Rptr. 30, 605 P.2d 859), the 1913 legislation created a Water Commission and provided a procedure for the appropriation of water for useful and beneficial purposes. (Stats. 1913, ch. 586, §§ 1, 15, 20, pp. 1013-1014, 1021, 1024, 1025.) Section 1201, derived from the 1913 Act, now provides: "All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code." (Note on Derivation, 68 West's Ann. Water Code (1971 ed.) fol. § 1201, p. 284.) A 1923 amendment to the Water Commission Act made the statutory application procedure the exclusive means of acquiring appropriative water rights. (Stats.1923, ch. 87, § 1, p. 162; § 1225.) The authority of the original Water Commission to regulate appropriative water rights is now vested in the SWRCB. (Shirokow, supra, at p. 308, fn. 8, 162 Cal.Rptr. 30, 605 P.2d 859; see § 179.)
After adoption of the 1913 Act, appropriative water rights were divided into two general categories: pre-1914 appropriative rights and post-1914 permitted and licensed rights. The SWRCB's permit and license system applies only to appropriations initiated after the December 19, 1914, effective date of the 1913 Act, and only to diversions from surface waters or subterranean streams in known and definite channels. (§§ 1200, 1202, subd. (c), 1225, 1250; Shirokow, supra, 26 Cal.3d at p. 309, 162 Cal.Rptr. 30, 605 P.2d 859.) Post-1914 permits and licenses represent 40 percent of California water subject to water rights.[6]

4. Publicly Held Rights
Public entities and public utilities account for the largest diversions of water under post-1914 licenses and permits. These public permit and license holders include the Central Valley Project (CVP), the State Water Project (SWP), hydroelectric power companies, large irrigation districts, and municipal water suppliers. Together, the CVP and SWP service areas cover most of the state. (Central Delta Water Agency v. State Water Resources Control Bd. (2004) 124 Cal.App.4th 245, 252-253, 20 Cal.Rptr.3d 898 (Central Delta).)
The SWP is a water storage and delivery system created by statute which consists of dams, reservoirs, and power and pumping plants operated by the California Department of Water Resources which holds the water rights for the project. Its operation is coordinated with the Bureau's operation of the CVP. Like the Bureau, the Department of Water Resources contracts to supply water to agricultural and urban water contractors throughout the state. (Central Delta, supra, 124 Cal. App.4th at p. 254, fn. 4, 20 Cal.Rptr.3d 898.) SWP water rights are included in the 40 percent of existing water rights held under post-1914 permits and licenses.[7]
*452 Listed by the SWRCB separately from other public holders of post-1914 permits and licenses, the United States government holds rights to 22 percent of the water subject to water rights under the Division.[8] The United States Bureau of Reclamation (Bureau) operates the CVP under permits granted by the SWRCB, and contracts out its care, operation and maintenance. The SWRCB regulates the Bureau as CVP's permit holder. Federal contractors are responsible for the control, distribution and use of all water delivered under CVP contracts. However, these federal contracts affect only 6.6 million acre-feet of water out of 116 million acre-feet allocated under the Bureau's permits.[9]

5. Characteristics of California Water Rights
"Both riparian and appropriative rights are usufructuary only and confer no right of private ownership in the watercourse," which belongs to the state.[10] (Shirokow, supra, 26 Cal.3d at p. 307, 162 Cal.Rptr. 30, 605 P.2d 859; see § 102.) At the same time, California courts recognize that "once rights to use water are acquired, they become vested property rights" appurtenant to the land. (United States v. State Water Resources Control Bd. (1986) 182 Cal.App.3d 82, 101, 227 Cal.Rptr. 161; see Fullerton v. State Water Resources Control Bd, (1979) 90 Cal. App.3d 590, 598,153 Cal.Rptr. 518.)
In the eyes of the Legislature and the SWRCB, federal contractors have no property rights in the permits and licenses held by the Bureau and their standing to challenge changes in permits and licenses is no greater than that of the general public. (§ 1540; Cal. State Water Resources Control Bd. Dec. No. 1641 (March 16, 2000) at p. 129.)[11]

D. Senate Bill No. 1049

Senate Bill No. 1049, inter alia, affected the Water Code by repealing certain sections and enacting sections 1525, 1530, 1535, 1536, 1537, 1540, 1551 and 1560. Even though the parties challenge only sections 1525, 1540 and 1560, a brief overview of the background and relevant provisions of the challenged legislation is useful in our analysis.

I. The Legislative Analyst's Recommendations
Historically, the General Fund has supported most of the cost of the Division's program, with fees supplying only 0.5 percent of the total program cost of the Division. In an effort to reduce the state's budget shortfall, the Legislative, Analyst's Office (LAO) recommended reduction of General Fund support for the water rights program in fiscal year 2003-2004. The LAO proposed that the General Fund support the water rights program for the first half of the fiscal year, and fee increases cover the $4.4 million needed for the second half of the fiscal year. The LAO also recommended that the entire Division program be fee supported in fiscal year 2004-2005.
*453 The SWRCB strongly objected to the proposed change in the Division's funding source, arguing: "The LAO's recommendation is based on an assumption that all water right actions benefit [] the regulated community (water right permit and license holders). This assumption is not true. In many instances, the prior rights that are protected by the imposition of permit conditions in new permits or by the enforcement of permits and licenses are rights that are held by parties other than post-1914 appropriative right holders. If the goal is that the party receiving the benefit pay their proportional share of the costs of the program, individuals who use groundwater and those who use surface water under some other basis of right should pay a portion of the program costs. The SWRCB's responsibility over non-permit holders is not included in the LAO recommendation. Certainly a portion of the SWRCB's regulatory/supervision function can and should be logically supported by the General Fund." (Italics added.) Victoria Whitney, the Division's current chief, testified under oath at her deposition that the response to the LAO recommendations was a correct statement.
The SWRCB also argued that "[m]any of the Division's activities also support the State's public trust resources benefiting all Californians. These activities should be supported by the State's General Fund."
The Division's budget in the 2003 Budget Act reflected the LAO's recommendations. (Stats.2003, ch. 157 [Item No. 3940-001-0001], pp. 234-235.) The Legislature adopted Senate Bill No. 1049, to implement the fee program. (Stats.2003, ch. 741, § 85.) It contained the statutes that authorize and implement the Division's imposition of annual fees on the holders of water right permits and licenses.

2. The Fee Legislation
The SWRCB fee legislation enacted as part of Senate Bill No. 1049 is found in Division 2 of the Water Code in a chapter titled "Water Right Fees." Division 2 broadly concerns the determination of water rights, and the appropriation and distribution of water in watermaster service areas. (See listing of parts in 68 West's Ann. Water Code (1971 ed.) before § 1000, p. 223.)

a. Section 1525
Section 1525 sets forth the parties and entities subject to the new fees. It contains three subdivisions. Subdivision (a) requires the SWRCB to adopt a schedule of annual fees to be paid by each holder of a permit or license to appropriate water and each lessor of certain leased water. Subdivision (b) requires the SWRCB to establish a schedule of one-time fees to be paid by applicants for permits to appropriate water and to approve leases, and for petitions relating to those applications. Subdivision (c) requires that the fee schedules generate fees in an amount necessary to "recover [the] costs incurred" in performing the services described in subdivisions (a), (b) and (c). These services include the "issuance, administration, review, monitoring, and enforcement" of water right permits and licenses. Subdivision (d) requires that the SWRCB collect the fees authorized by subdivisions (a), (b) and (c) "at an amount equal to the revenue levels set forth in the annual Budget Act for this activity," namely, the "activity" of issuing the permits and licenses, and carrying out the tasks identified in those subdivisions. (§ 1525, italics added.)[12]

*454 b. Section 1530

d. Section 1536
Section 1530 directs the SWRCB to set the fees by emergency regulation.

c. Section 1535
Section 1535 requires that fees for filing an application, request or proof of claim, other than an annual fee, be paid to the SWRCB.

d. Section 1536
Section 1536 provides that annual fees, other than initial filing fees, be paid to the State Board of Equalization (BOE).

e. Section 1537
If a section 1525, subdivision (b) fee is not paid, the SWRCB may cancel the related application, request or proof of claim, and refer the matter to the BOE for collection. (§ 1525, subd. (b).) The Board of Equalization (BOE) collects and refunds annual fees collected under the Fee Collection *455 Procedures Law, part of the Revenue and Taxation Code, as limited by subdivisions (b)(2)b through (b)(4) of section 1537. (§ 1537.) [Subdivision (b)(2) of section 1537 provides that a determination by the SWRCB that a "person or entity" is required to pay a fee, or regarding the amount of the fee, is subject to the administrative adjudication procedures of section 1120 et seq., which governs reconsideration, amendment and judicial review of water right decisions and orders.[13] Section 1126 provides for judicial review of SWRCB's decisions relating to state water law.[14] Subdivision (b)(3) provides that the BOE shall not accept any claim for a refund under the Fee Collection Procedures Law on the ground the fee was "incorrectly determined" or "improperly or erroneously calculated" unless "that determination has been set aside by the [SWRCB] or a court reviewing the determination of the Board." Subdivision (b)(4) then provides that the administrative adjudication provisions of section 1126 shall not be construed to apply to "the adoption of [quasi legislative] regulations" pursuant to section 1530. Subdivision (b)(4) does not appear to apply to a facial challenge to the regulations. As we shall explain, the BOE has no role in reviewing refund claims under section 1537 or the emergency regulations.

f. Sections 1540 and 1560
Sections 1540 and 1560 concern the allocation of annual fees, or an appropriate portion of the fees, to persons who have contracts with fee payers who decline to pay based on their sovereign immunity.[15]

*456 g. Section 1551

Section 1551 creates a Water Rights Fund into which the BOE must deposit the fees it collects on behalf of the SWRGB. The Water Rights Fund is separate from the General Fund and the fees collected may be used only for programs specified in section 1552. These include the expenditures by the BOE in connection with collecting the SWRCB fees, payment of refunds pursuant to the Revenue and Taxation Code, and expenditures by the SWRCB "for the purposes of carrying out" the work of the Water Rights Division.

3. The Emergency Regulations
The SWRCB faced numerous problems in establishing the new fee schedule mandated by section 1525. First, the SWRCB had to raise $4 .4 million immediately to cover the cost of the water rights program in the second half of the 2003-2004 fiscal year.[16] Second, the funding source had to be "relatively stable." Third, because of time constraints, SWRCB had to rely on its existing data base in calculating the amount of fees to be assessed. Fourth, although it cost SWRCB between $17,000 and $20,000 to process an application to appropriate water, SWRCB expected people would not seek SWRCB services if the one-time service fees were too high. Fifth, because most persons and entities subject to the annual fee held permits or licenses for less than 10 acre-feet of water, a minimum fee was necessary to cover the cost of sending out the fee bills. Sixth, SWRCB anticipated that 40 percent of the water right permit and license holders would refuse to pay annual fees. Seventh, the SWRCB did not have permitting authority over certain holders of water rights (specifically the holders of riparian, pueblo and pre-1914 appropriative rights) amounting to approximately 38 percent of the water diverted in the state.
California Code of Regulations, title 23, sections 1066 and 1073 (regulations 1066 *457 and 1073) established formulas for calculating the annual fees imposed on holders of water right permits and licenses and the federal contractors.

a. Annual Fee Formula For Permit and License Holders
Subdivision (a) of regulation 1066 provides: "A person who holds a water right permit or license shall pay an annual fee that is the greater of $100 or $0.03 per acre-foot based on the total annual amount of diversion authorized by the permit or license." (Cal.Code Regs., tit. 23, § 1066, subd. (a), Register 2003, No. 52 (Dec. 23, 2003).)
The SWRCB based the annual fee "on the total annual amount of diversion authorized by the permit or license, without regard to the availability of water for diversion or any bypass requirements or other conditions or constraints that may have the practical effect of limiting diversions but do not constitute a condition of the permit or license that expressly sets a maximum amount of diversion." (Cal. Code Regs., tit. 23, § 1066, subd. (b).) If a person or entity held "multiple water rights that contain[ed] an annual diversion limitation that [was] applicable to the combination of those rights, but the person [could] still divert the full amount authorized under a particular right, then the fee [was] based on the total annual amount for that individual right." (Cal.Code Regs., tit. 23, § 1066, subd. (b)(3).)
To determine how much permit and license holders should be charged in annual fees under regulation 1066, the SWRCB began with the $4.4 million budget amount and assumed it would be unable to collect 40 percent of billed revenues from water right holders who claimed sovereign immunity or simply refused to pay their bills. It divided the $4.4 million mandated by the Legislature by 0.6 to account for the estimated 40 percent non-collection rate, increasing the target revenue to around $7 million.
The SWRCB admitted that the permit and license holders paid for benefits received by a significant number of water right holders not required to pay the annual fees. The estimated 40 percent of water right holders who did not pay the annual fee based on claims of sovereign immunity or simple refusal benefited from the Division's activities "[t]he same way that everybody else benefits." Holders of riparian, pueblo, and pre-1914 appropriative water rights, representing approximately 38 percent of all water diverted, also benefited from SWRCB activities. However, the SWRCB had no permitting authority over riparian, pueblo and pre-1914 appropriative water right holders, and did not impose on them the annual fees required by section 1525, subdivision (a).
According to the SWRCB, 45 percent of those holding water right permits and licenses diverted less than 10 acre-feet of water, and 70 percent of the permit and license holders diverted less than 100 acre-feet of water. However, the SWRCB imposed the $100 minimum annual fee on all these water right holders. (Cal.Code Regs., tit. 23, § 1066, subd. (a), Register 2003, No. 52 (Dec. 23, 2003).) Thus, regulation 1066 effectively charged persons who diverted less than 10 acre-feet of water under a SWRCB permit or license the same as those who diverted 3,333 acre-feet of water.

b. Annual Fee Formula For Federal Contractors
Subdivision (b)(2) of regulation 1073 supplied the formula for calculating the annual fee imposed on federal contractors "[i]f the [Bureau] decline[d] or [was] likely to decline to pay the fee or expense ... for *458 the CVP." (Cal.Code Regs, tit. 23, § 1073, subd. (b)(2).)
The SWRCB provided the following description of how it calculated the fee: "For FY 2003-2004 the annual fees associated with the Bureau water rights were calculated based on the greater of $100 or $0.03 per acre-foot, similarly to the way fees were calculated for all other permit and license holders. The total amount authorized for diversion under the Bureau's permits and licenses was calculated at 116 million acre-feet (MAF). The regulations also provide a 50 percent discount for all hydropower permits and licenses.... [W]ith the discount, this total amount of water under the Bureau's water rights subject to fees was reduced to 86 MAF. The total annual fee associated with all of the Bureau's permits for FY 2003-2004 was $2,593,343. The amount assessed for permits and licenses for the CVP was $2,452,716.
"The regulations provide that the contractors for each of the Bureau's projects will be prorated a share of the annual fees associated with that project based on the amount of water the contractor has contracted for. The sum of all project supply contracts for the CVP was 6.6 MAF. Therefore, each CVP contractor was assessed a fee equal to his or her individual contracted project supply divided by 6.6 MAF with the quotient multiplied by $2,452,716. This resulted in fees of approximately $0.37 per acre-foot of the contracted amount."
In other words, the SWRCB assessed annual fees against federal contractors based on a prorated portion of the total amount of annual fees associated with all the Bureau permits and licenses.

E. Plaintiffs' Response To the Imposition of Annual Fees

In January 2004, the BOE sent notices of determination (water right fee bills) to the persons and entities described in section 1525, and to the federal contractors. SWRCB collected $7.4 million in water right fees for fiscal year 2003-2004. The Budget Act set a target of only $4.4 million in fee revenue because the balance for the first half of 2003-2004 was paid from General Fund revenue.
The NCWA and CVPWA plaintiffs filed their complaint for declaratory and injunctive relief and petition for writ of mandate in Sacramento County Superior Court case No. 03CS01776 on December 17, 2003. Two months later the NCWA, CVPWA and Farm Bureau unsuccessfully petitioned for reconsideration and refund of annual fees pursuant to sections 1120 et seq. and 1537, subdivision (b)(2), and California Code of Regulations, title 23, section 768 et seq, in accordance with the procedure described by the SWRCB. Thereafter, on April 13, 2004, the Farm Bureau filed its complaint for declaratory and injunctive relief and petition for writ of mandate case No. 04CS00473. The NCWA and CVPWA amended their complaint and petition on May 7, 2004 to allege denial of its petition before the SWRCB and to add additional named plaintiffs pursuant to a stipulation with the SWRCB.[17] The court consolidated the two actions for all purposes.
Following a hearing on April 15, 2005, the trial court denied plaintiffs' petitions for writ of mandate. The trial court ruled the fees imposed under section 1525 and *459 the emergency regulations were valid regulatory fees. It also rejected plaintiffs' other constitutional claims. This appeal ensued.

DISCUSSION

I

Lawful Regulatory Fees and Unconstitutional Taxes
In 1978, California voters approved Proposition 13, a constitutional amendment promising property tax relief. (Cal. Const., art. XIII A, §§ 1-4, added by initiative, Primary Elec. (June 6, 1978); Ballot Pamp., Primary Elec. (June 6, 1978, argument in favor of Prop. 13, pp. 58, 59.) Proposition 13's interlocking provisions limit real property tax rates and assessments, and place restrictions on state and local government's power to tax real property. (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 218, 231, 149 Cal. Rptr. 239, 583 P.2d 1281.)
With respect to the state power to tax, article XIII A, section 3 of the California Constitution provides: "From and after the effective date of this article, any changes in state taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."
Regulatory fees are an exception to the requirements of Proposition 13. Such fees are valid only if they "'"do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and [they] are not levied for unrelated revenue purposes." [Citations.]' [Citations.]" (Sinclair Paint Co. v. State Bd. of Equalization (1997) 15 Cal.4th 866, 876, 64 Cal.Rptr.2d 447, 937 P.2d 1350 (Sinclair); Cal. Assn. of Prof. Scientists v. Dept. of Fish & Game (2000) 79 Cal.App.4th 935, 945, 94 Cal.Rptr.2d 535 (CAPS).) "Ordinarily, `taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted' and `[m]ost taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges.'" (CAPS, supra, at p. 944, 94 Cal.Rptr.2d 535, quoting Sinclair, supra, at pp. 873-874, 64 Cal.Rptr.2d 447, 937 P.2d 1350.)
As we explained in CAPS, Sinclair was the first published post-Proposition 13 case to consider whether a fee imposed by the state was in effect a tax that violated article XIII A, section 3 of the California Constitution. (CAPS, supra, 79 Cal. App.4th at p. 944, 94 Cal.Rptr.2d 535.) The Sinclair court made two distinctions relevant to the case before us.
First, because there is a "close, `interlocking' relationship" between the tax limitation sections of Proposition 13 (Cal. Const., art. XIII A, §§ 3 & 4), cases involving local exactions "may be helpful, though not conclusive" in deciding whether a fee imposed by the state is an unlawful tax. (Sinclair, supra, 15 Cal.4th at p. 873, 64 Cal.Rptr.2d 447, 937 P.2d 1350.)
Second, Sinclair also identified "three very different kinds of fees" routinely challenged under Proposition 13: special assessments based on the value of benefits conferred on property, development fees exacted in return for permits or other government privileges, and regulatory fees"an entirely different animal"enacted under the police power. (CAPS, supra, *460 79 Cal.App.4th at p. 944, 94 Cal. Rptr.2d 535.) In CAPS, we alerted the parties to the danger in "extracting] general principles from cases involving one type of fee and applying] them to cases involving a completely different type of fee." (CAPS, supra, at p. 944, 94 Cal. Rptr.2d 535.) The issue in this case involves an annual fee imposed on a regulated community, holders of water right permits and licenses, and in the case of the CVP, those who contract with the federal government, which also holds water rights. Thus, this case, like Sinclair and CAPS, involves regulatory fees.

II

Burden of Proof and Standard of Review
When challenged on grounds a fee is an unlawful tax, the state must show: "(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.'" (Sinclair, supra, 15 Cal.4th at p. 878, 64 Cal. Rptr.2d 447, 937 P.2d 1350; CAPS, supra, 79 Cal.App.4th at p. 945, 94 Cal.Rptr.2d 535.) Language in the court's order suggests the court erroneously placed the burden of proof on plaintiffs. This misallocation of the burden left open the possibility that the SWRCB did not adduce all evidence at its disposal at trial. Accordingly, we requested supplemental briefing, and the parties submitted supplemental briefs on the question `whether the parties adduced all relevant evidence at their disposal in the trial court." The SWRCB responded that it had not adduced all relevant evidence at its disposal but had satisfied the burden of proof. Because the issues in the cases were "primarily legal rather than factual," the SWRCB concluded, "any further evidence at trial would have been either irrelevant ok cumulative  "We perceive no prejudice to any party from the trial court's misallocation of the burden of proof.
On appeal, the question whether the annual fees imposed under section 1525, subdivision (a) are unconstitutional and the emergency regulations invalid are questions of law subject to our independent review. (Sinclair, supra, 15 Cal.4th at p. 874, 64 Cal.Rptr.2d 447, 937 P.2d 1350.) Contrary to the SWRCB's suggestion, plaintiffs do not argue that the agency overstepped its quasi-legislative, rulemaking authority under section 1525. Thus, the deferential standard applied to the review of quasi-legislative actions by ordinary mandamus in Shapell Industries, Inc. v. Governing Bd. (1991) 1 Cal.App.4th 218, 225, 230-233, 1 Cal.Rptr.2d 818, is inapplicable here.

III

The Regulated Community: Permit and License Holders

A. Section 1525 Is Constitutional On Its Face

Plaintiffs argue the fees the SWRCB collected in the 2003-2004 fiscal year pursuant to section 1525 are unconstitutional taxes because they were excessive, that is, amounted to more than the cost of the regulatory activity. We reject plaintiffs' argument that the mere collection of excess fees by the SWRCB readers the authorizing legislation unconstitutional.
Preliminary, we note that plaintiffs do not challenge subdivision (b) of section 1525, which authorizes adoption of a fee schedule for permit applicants and petitioners for various changes in their permits, nor the part of the emergency regulations *461 that impose a one-time filing fee. Plaintiffs apparently do challenge section 1525, subdivision (c), but only on the view that it "direct[s] the SWRCB to impose fees to cover all costs incurred by the SWRCB's Division of Water Rights." (Italics added.) It does not, as we shall explain.
Regulatory fees are valid only if they "`"do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and [they] are not levied for unrelated revenue purposes." [Citations.]' [Citations.]" (Sinclair, supra, 15 Cal.4th at p. 876, 64 Cal. Rptr.2d 447, 937 P.2d 1350; CAPS, supra, 79 Cal.App.4th at p. 945, 94 Cal.Rptr.2d 535.) The second point is critical, because, regardless of whether the annual fees in this case exceed the reasonable cost of the services performed, they are related to the services performed and are not imposed for general revenue purposes. This bears on the remedy available.
"Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax." (Barratt American, Inc. v. City of Rancho Cucamonga (2005) 37 Cal.4th 685, 700, 37 Cal. Rptr.3d 149, 124 P.3d 719, citing the "reverse logic" analysis of Alamo Rent-A-Car, Inc. v. Board of Supervisors (1990) 221 Cal.App.3d 198, 205-206, 272 Cal.Rptr. 19 (Alamo).) It is an analytical error to conclude by reverse logic that if a regulatory fee does not meet the reasonable cost requirements of Government Code section 50076,[18] "then it must be a special tax." (Alamo, supra, at pp. 205-206, 272 Cal. Rptr. 19.) "In short, article XIII A does not apply to every regulatory fee simply because, as applied to one or another of the payor class, the fee is disproportionate to the service rendered." (Brydon v. East Bay Mun. Utility Dist. (1994) 24 Cal. App.4th 178, 194, 29 Cal.Rptr.2d 128 (Brydon).)
The purpose of the legislation is determined by examining the language of section 1525 and the succeeding sections, and not, as suggested by Farm Bureau plaintiffs, the SWRCB's musings to the Legislative Analyst or the Legislative Analyst's recommendations to the Legislature. The annual fees imposed under section 1525 are manifestly not collected for general revenue purposes.
It is clear that the statutory structure of section 1525 concerns only the costs of the functions or activities described in section 1525 and that the fees collected for those functions or activities are to be deposited in the Water Rights Fund, not in the General Fund. (§§ 1551, 1552.) Section 1551 lists the fees to be deposited into the Water Rights Fund including all fees collected by the SWRCB or the State Board of Equalization. Section 1552 describes for what purpose the money in the Water Rights Fund is available for expenditure. The fees come from various sources, including some that do not involve the services described in section 1525.[19] (§ 1551.) *462 It cannot be argued that because sections 1551 and 1552 list a variety of items to be deposited in the Water Rights Fund, some of which do not involve the services, activities or functions for which fees are collected under section 1525, that the fees are excess fees.
Section 1552 does not describe how the various fees deposited in the Water Rights Fund are to be allocated, but there is nothing in section 1552 that precludes the segregation and application of the fees collected pursuant to section 1525 to services described in that section.[20] This is an accounting issue that concerns how the monies are treated within the Water Rights Fund.
As noted, there is no challenge to the constitutionality of subdivision (b) of section 1525. And there is nothing in the "total amount" or "total revenue" provisions of subdivisions (c) and (d) that requires the SWRCB to set the fees so as to collect anything more than the administrative "costs incurred" in carrying out the permit functions authorized in subdivisions (a), (b) and (c). Thus, subdivision (c) directs the SWRCB to set the fee schedules so that the "total amount of fees collected ... equals that amount necessary to recover costs incurred in connection with" the administration of the provisions of subdivisions (a) and (b). (Italics added.) Subdivision (d)(3) directs that the SWRCB "shall set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the revenue levels set forth in the annual Budget Act for this activity. ..."[21] (Italics *463 added.) In addition, subdivision (d)(3) provides a fail-safe by authorizing the SWRCB to "further adjust the annual fees" if it "determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the annual Budget Act...."
Read in this manner, the purpose of section 1525 et seq. is not to raise general revenues but to defray the costs of performing the services for which the fees are collected. Since the legitimate charging of fees for these services is not challenged by the plaintiffs, it cannot be claimed the legislation has any other purpose. Accordingly, plaintiffs' facial challenge to section 1525 is reduced to the equation that an excess of fees collected over that necessary to defray the costs is equal to a tax, a conclusion not warranted by case law.
We also reject the plaintiffs' argument the SWRCB fees were imposed "solely on the basis [the fee payers] own[ed] real property" and therefore are unconstitutional ad valorem taxes. The property interests at issue here "are usufructuary only and confer no right of private ownership in the watercourse," which belongs to the state. (Shirokow, supra, 26 Cal.3d at p. 307, 162 Cal.Rptr. 30, 605 P.2d 859; § 102.) Potentially conflicting water right claims and uses, not real property ownership, give rise to the need for regulation through the system of permits and licenses administered by the Division.

B. The Fees Are Unlawful As Applied By Regulation 1066

Plaintiffs' contention the annual fees imposed under section 1525 do not bear a fair or reasonable relationship to the fee payers' burdens on or benefits from regulatory activity challenges the SWRCB's application of section 1525 through the fee schedule formula set forth in regulation 1066. Plaintiffs cite at least two ways the annual fees are unlawful as applied. First, although the Division provides services to holders of riparian, pueblo and pre-1914 appropriative water rights, and those claiming sovereign immunity, collectively representing 60 percent of the water held under water rights, section 1066 mandates collection of annual fees from holders of water right permits and licenses that account for only 40 percent of the water held under water rights. Second, plaintiffs contend that regulation 1066 "impermissibly impose[s] costs disproportionately amongst the annual feepayors [sic] themselves, such that some feepayors [sic] pay vastly more than others on a per acre-foot basis...."
As we explained, in regulatory fee cases, the state also has the burden of showing "the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.'" (Sinclair, supra, 15 Cal.4th at p. 878, 64 Cal.Rptr.2d 447, 937 P.2d 1350, quoting San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist. (1988) 203 Cal.App.3d 1132, 1135, 250 Cal.Rptr. 420 (SDG & E).) Proportionality need not be proved on an individual basis. (Pennell v. City of San Jose (1986) 42 Cal.3d 365, 375, fn. 11, 228 Cal. Rptr. 726, 721 P.2d 1111 [fact that fee payers may not believe they benefit from *464 regulatory program does not transform a regulatory fee into an unlawful tax].)
As we noted in CAPS, "Sinclair is noteworthy for its expansive legitimation of regulatory fees ... based on [the paint manufacturers'] market share or their past and present responsibility for environmental lead contamination.... [¶] As broad as the implications of Sinclair are, the Supreme Court did not have to reach the troublesome issue of proportionality" given the factual and procedural circumstances of that case. (CAPS, supra, 79 Cal. App.4th at p. 947, 94 Cal.Rptr.2d 535.) We addressed the question of proportionality in CAPS and we must address it here.
In CAPS, we upheld against a constitutional challenge to fees charged by the Department of Fish and Game to cover a portion of the cost of meeting environmental review obligations under the California Environmental Quality Act (CEQA) and the Z'Berg-Nejedly Forest Practice Act of 1973 (Fish & Game Code, § 711.4; Pub. Resources Code, §§ 4511, 21000 et seq.) (79 Cal.App.4th at pp. 939-940, 94 Cal. Rptr.2d 535.) Tie fee statute at issue required flat fees, that is, a $1,250 filing fee for projects with negative declarations and $850 for projects with environmental impact reports. (Id. at p. 940, 94 Cal. Rptr.2d 535.) The statute exempted from the filing fee projects with de minimis effect on fish and wildlife. These latter projects amounted to 68 percent of the projects potentially subject to agency review. (Id. at p. 943, 94 Cal.Rptr.2d 535.) In CAPS, the principal issue was whether the flat fees passed constitutional muster. (Id. at p. 939, 94 Cal.Rptr.2d 535.)
Two mitigating effects cases, SDG & E, supra, 203 Cal.App.3d 1132, 1147-1148, 250 Cal.Rptr. 420 [approving apportionment based in part on amount of emissions on premise that the more emissions, the greater the regulatory job of the district] and Brydon, supra, 24 Cal.App.4th 178, 29 Cal.Rptr.2d 128 [approving new structure of water rates to increase price per cubic foot for increased usage to meet conservation objectives], informed our decision in CAPS to apply "a flexible assessment of proportionality within a broad range of reasonableness in setting fees." 79 Cal. App.4th at p. 949, 94 Cal.Rptr.2d 535.) Rejecting a user fee analysis, we observed that, "[r]egulatory fees, unlike other types of user fees, often are not easily correlated to a specific, ascertainable cost. This may be due to the complexity of the regulatory scheme and the multifaceted responsibilities of the department or agency charged with implementing or enforcing the applicable regulations; the multifaceted responsibilities of each of the employees who are charged with implementing or enforcing the regulations; the intermingled functions of various departments as well as intermingled funding sources; and expansive accounting systems which are not designed to track specific tasks." (Id. at p. 950, 94 Cal.Rptr.2d 535.) However, the phrase "fair or reasonable relationship" implies that there may exist a fee scheme that bears an un fair and un reasonable relationship to the payers burdens on and benefits from the regulatory programin other words, where it is impossible to apply "a flexible assessment of proportionality." We believe the fee structure in this case crosses the line.
The case before us lacks some of the complexities we described in CAPS. Here, the regulatory activities are those of a single Division with three component parts within the SWRCB; a single Division specifically charged with issuing water right permits and licenses, and maintaining records of the appropriation and use of all waters within the state. There is a clear assignment of roles within each section or *465 component of the Division and only a dual, now single, funding source.
However, this case presents complexities of a different sort. By quirk of historical development, the SWRCB lacks authority to impose annual fees on the holders of riparian, pueblo and pre-1914 appropriative rights that account for 38 percent of the water subject to water rights. Nor does the SWRCB demand that the Bureau pay annual fees on the water rights it holds for 22 percent of California water subject to water rights.[22] But unlike CAPS where the 68 percent of projects potentially subject to filing fees were properly exempted because they had de minimis effect on fish and wildlife, here the Division's regulatory program protects the non-paying holders of prior rights (riparian, pueblo and pre-1914 appropriative water right holders) as against all post-1914 applications and permits regarding appropriations. As Whitney told the LAO, "Approximately 30 percent of the appropriated water in California is held by the federal government, which refuses to pay [service] fees.... Of the total water beneficially used, 30 percent or more may be held by pre-1914 and riparian water right holders whose use is not routinely supervised by the Board. Nonetheless, such users receive benefits from the Water Rights Program in terms of complaint resolution, protection of existing rights, and on occasion, adjudication of present rights...." In addition, the SWRCB admits that the holders of water rights representing 40 percent of California's water and were assessed the annual fee subsidized the cost of processing certain applications and petitions thereby reducing the one-time fees assessed under section 1525, subdivision (b) and California Code of Regulations, title 23, §§ 1062-1064. Indeed, the SWRCB collected only 10 percent of that cost in one-time service fees and the rest was borne, in part, by annual fee payers. The proportionality assessment in this case is further complicated by the SWRCB's admission that one-third of the work of the Division is for the benefit of the general public to protect the public trust and the environment.
In CAPS, the Department of Fish and Game demonstrated that the flat rate filing fees allocated to those seeking environmental review bore "a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.'" (79 Cal.App.4th at pp. 945, 950-955, 94 Cal. Rptr.2d 535.) The 68 percent of projects exempted from the filing fee placed no burden on the Department of Fish and Game's environmental review process because those projects had de minimis impact on fish and wildlife. (Id. at p. 943, 94 Cal.Rptr.2d 535.) Here, the SWRCB offered no breakdown of costs or other evidence to demonstrate that the services and benefits provided to the non-paying water right holders were de minimis. Indeed, it would be difficult to make the de minimis argument, given the evidence in the record regarding the role of the Division in protecting pre-1914 water rights and the allocation of Division resources. As previously noted, the resources of the Division are allocated as follows:
(1) Processing applications and petitions25 percent;
(2) Environmental review18 percent;
(3) Bay-Delta Project6 percent;
(4) Licensing and compliance21 percent;
(5) Hearings11 percent;
(6) Overhead19 percent.
Accordingly, we conclude the SWRCB failed to sustain its burden to show "the *466 basis for determining the manner in which the costs [were] apportioned [under California Code of Regulations, title 23, section 1066], so that charges allocated to a payor [bore] a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.'" (Sinclair, supra, 15 Cal.4th at p. 878, 64 Cal.Rptr.2d 447, 937 P.2d 1350, quoting SDG & E, supra, 203 Cal.App.3d at p. 1135, 250 Cal.Rptr. 420.)
The SWRCB argues that the "polluter pays" rationale of SDG & E applies to justify the annual fee allocation in this case because "[t]he regulatory activities the fees support serve an important public purpose and so constitute a valid exercise of the police power." The SWRCB stresses that fulfilling the constitutional mandate to maximize the beneficial use of water (Cal. Const., art. X, § 2) also means preventing waste and unreasonable use. Paraphrasing the language of SDG & E, but without citing factual support, SWRCB asserts that "[t]he purpose for the Division's existence is to regulate the diversion and use of water, and it is reasonable to allocate its costs based on the premise that the greater the diversion authorized, the greater the regulatory job." (See SDG & E, supra, 203 Cal.App.3d at pp. 1147-1148, 250 Cal.Rptr. 420.) The SWRCB did not provide any evidence to show the allocation of the actual cost of Division services provided to the holders of riparian, pueblo and pre-1914 appropriative water rights which hold 38 percent of the water subject to water rights. Nor was there evidence of the actual cost of Division services provided to the Bureau which holds 22 percent of the water subject to water rights. Without any evidence to show the allocation of actual costs of Division services to those collectively representing 60 percent of water diverted, we reject the claim the "polluter pays" rationale justifies imposing annual fees on the license and permit holders who represent the remaining 40 percent. At the same time, however, we reject plaintiffs' argument there was an inequitable apportionment of fees among the designated annual fee payers. Although the SWRCB did not offer evidence of the actual cost of billing the annual fees, we cannot say a $100 minimum annual fee was an unreasonable estimate of that cost.

IV

Federal Contractors 
As we explained, the Bureau operates the CVP under water rights permits issued by the SWRCB. Various public agencies contract with the Bureau for the care, operation and maintenance of the CVP. These federal contractors are responsible for the control, distribution and use of the water subject to their contracts. Federal contracts account for only 6.6 million acre-feet of the nearly 116 million acre-feet of water held under the Bureau's permits.

A. Sections 1540 and 1560 Are Constitutional On Their Face

The NCWA and CVPWA plaintiffs challenge the annual fees imposed on the federal contractors pursuant to sections 1540 and 1560 and regulation 1073 on grounds the fees violate the Supremacy Clause of the United States Constitution. (See McCulloch v. Maryland (1819) 4 Wheat. 316, 4 L.Ed. 579.) They also argue that the classifications drawn by the Legislature and the SWRCB in assessing annual fees against the federal contractors are irrational and arbitrary in violation of the state and federal rights of equal protection and substantive due process. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; 42 U.S.C. § 1983.)
*467 Under the doctrine of sovereign immunity, the federal government is immune from taxation by a state. (New York State Dept. of Environmental Conservation v. United States Dept. of Energy (N.D.N.Y. 1991) 772 F.Supp. 91, 95.) Section 1540 provides that if "the fee payer has sovereign immunity under section 1560," the SWRCB "may allocate the fee ..., or an appropriate portion of the fee ..., to persons or entities who have contracts for the delivery of water" from the fee payer. (Italics added.) Section 1560, subdivision (a) states that fees may be collected only "to the extent authorized under federal law...." Given this language, we conclude neither section 1540 nor 1560 sanctions imposition of a fee that violates the Supremacy Clause or state and federal rights to equal protection and due process. Once again, the difficulty is in the application of the statutes.

B. The Fees Are Unlawful As Applied by Regulation 1073

Citing several federal cases, the NCWA and CVPWA plaintiffs argue the SWRCB violated the Supremacy Clause by charging the federal contractors annual fees at the rate of $0.03 per acre-foot for close to the entire 116,331,177 acre-feet of water the Bureau holds under its permits and licenses.[23] Plaintiffs point out that "nowhere in the brief or in the record is there any evidence that any effort was made to determine what share of the claimed federal regulatory costs were fairly allocable to the CVP contractors. Instead, the entire federal burden was meted out proportionately to water uses that amount to less than 5% of water subject to federal permits and licenses." The SWRCB responds that it is justified in basing annual fees on the face value of the Bureau's water rights because limitations on the federal contractors' use of the water "are due to restrictions on the permits and licenses themselves, and not the contracts." The SWRCB offers nothing to support this claim. We conclude the fee schedule formula included in regulation 1073 is unlawful.
"[A]bsent its consent, the federal government and its instrumentalities are absolutely immune from direct taxation by a State. [Citations.]" (New York State Dept. of Environmental Conservation v. United States Dept. of Energy, supra, 772 F.Supp. at p. 95.) In other words, a state may not impose a fee or tax on federal property interests.[24] (See City of Detroit v. Murray Corp. (1958) 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441, 445.) To successfully defend a Supremacy Clause challenge to a tax on persons or entities that contract with the federal government, the state or local taxing authority must segregate and tax only the possessory interest the contractor has in the property. (See United States v. County of Fresno (1977) 429 U.S. 452, 453, 97 S.Ct. 699, 700, 50 L.Ed.2d 683, 686 (County of Fresno); compare United States v. Nye County Nevada (9th Cir.1991) 938 F.2d 1040, 1043 (Nye County); United States v. Hawkins County, Tennessee (6th Cir.1988) 859 F.2d 20, 24 (Hawkins County); and United States v. State of Colorado (10th Cir.1980) 627 F.2d 217, 221 (State of Colorado).)
In County of Fresno, the United States Supreme Court upheld imposition of an *468 annual use or property tax on federal employees on their possessory interest in housing owned by the United States Forest Service. The Forest Service required the affected employees to live in the housing it provided so they would be nearer their job sites and therefore better able to perform their duties in the national forests. (429 U.S. at p. 454, 97 S.Ct. at p. 700, 50 L.Ed.2d at p. 686.) The Forest Service viewed occupancy of the houses as partial compensation for the work of its employees. It deducted from their paychecks an amount fixed by "estimating the fair rental value of a similar house in the private sector and then discounting that figure to take account of other factors relating to location, absence of customary amenities and the Forest Service's exercise of rights as owner of the housing. (Id. at pp. 454455, 97 S.Ct. at pp. 700-701, 50 L.Ed.2d at pp. 687-688.) The employees challenged an annual use or property tax imposed by Fresno and Tuolomne Counties based on the annual estimated fair rental value of the houses. (Id. at pp. 456-457, 97 S.Ct. at pp. 701-702, 50 L.Ed.2d at pp. (588-689.) The United States Supreme Court ruled that a state may, "in effect, raise revenues on the basis of property owned by the United States as long as that property is being used by a private citizen ... and so long as it is the possession or use by the private citizen that is being taxed." (Id. at p. 462, 97 S.Ct. at p. 704, 50 L.Ed.2d at p. 692.) Stated differently, `The use of property of the United States may be taxed to a private contractor, even if the economic burden of the tax is ultimately borne by the United States, but only to the extent that the contractor has the beneficial use of the property. That is, the contractor may not be taxed beyond the value of his use. The use of property in connection with commercial activities carried on for profit is a separate and distinct taxable activity." (Hawkins County, supra, 859 F.2d at p. 23, italics added.)
State of Colorado involved a county's attempt to impose a "user" tax on Rockwell International Corporation (Rockwell), which operated the Rocky Flats nuclear weapons plant under contract with the United States government. The challenged statute stated that the user of real property was "`subject to taxation in the same amount and to the same extent as though the lessee ... were the owner of such property...."' (627 F.2d at p. 218.) The county assessor based Rockwell's tax on the assessed value of the land, improvements, and machinery and equipment at Rocky Flats. (Ibid.) The Tenth Circuit observed that Rockwell provided managerial services at Rocky Flats but did "not have any lease, permit or license to the property in question, which is owned in fee simple by the United States." (Id. at p. 219.) It ruled the tax unconstitutional, concluding that "the `substance' of the ... procedure is not to tax Rockwell's `use' of government owned property, but to lay an ad valorem general property tax on property owned by the United States." (Id. at p. 221.) Rockwell had no property interest separate from that of the United States.
The Sixth Circuit reached a similar result in Hawkins County. In that case, Holston Defense Corporation, a private contractor, operated and maintained the Holston Army Ammunition Plant under a cost-plus contract with the United States government. (859 F.2d at pp. 21-22.) The Tennessee Legislature enacted a statute which assessed property of the United States to the user of the property "at its real property value, minus a deduction for any contractual restrictions on its use, unless the property [was] used for an exclusively public purpose, or the user [was] an agent or instrumentality of the United *469 States." (Id. at p. 22, fn. omitted.) The county assessor calculated the tax based on the replacement cost of real and personal property at the munitions facility. (Ibid.) Acknowledging that a private contractor may be taxed on its use of federal propertybut only to the extent of its beneficial usethe Sixth Circuit concluded that the Tennessee statute "fairly cannot be said to impose a tax on Holston's beneficial use...." (Id. at p. 23.) Instead, the statute assessed the purported user tax "at a value determined pursuant to other sections of the code which spell out the procedure for calculating the value of real property for purposes of the state's ad valorem tax." (Ibid.) "Since Holston [was] determined not to have a real property interest in the facility, Tennessee's attempt to tax Holston resulted in what was, in reality, a tax upon the United States itself." (Id. at p. 24.)
In Nye County, the United States successfully challenged imposition of a personal property tax against Arcata Associates, Inc. (Arcata), an independent federal defense contractor at an Air Force installation in Nevada. (938 F.2d at p. 1041.) The court noted that "[t]he Air Force directs Arcata's operation of all government-owned equipment. Arcata does not have the right to use the equipment for its own account or business. It has no property interest in the equipment. Its only access to the equipment is at the time and place and in the manner directed by the United States." (Ibid.) The Ninth Circuit ruled the tax violated the Supremacy Clause by comparing tax measures that have survived with those that have perished in the face of constitutional challenge. (Id. at p. 1042.) Citing County of Fresno, it emphasized that "[t]he survivors have been tax measures imposed on an isolated possessory interest or beneficial use of United States property. The perished have been tax measures levied on the property itself." (Ibid.) The Ninth Circuit struck down the Nye County tax, stating, "Here, the property belongs to the United States. Arcata has no leasehold interest in it, but merely has the privilege, terminable at the will of the government, to use the property at the time and place and in the manner directed by the United States. Nye County makes no attempt to segregate and tax any possessory interest Arcata may have in the property, or Arcata's beneficial use of the property. Nye County simply taxes Arcata as if it were the owner of the property. The tax effectively lays `an ad valorem general property tax on property owned by the United States.'" (Id. at p. 1043, italics added & omitted.)
These four cases demonstrate that the SWRCB has authority to impose a regulatory fee on the federal contractors, but only to the extent of the federal contractors' contractual interest in the Bureau's water rights permits. Sections 1540 and 1560 do not impose an unlawful levy on the federal contractors, but regulation 1073's formula for allocating annual fees violates the Supremacy Clause by requiring the federal contractors to pay for the entire amount of annual fees that would otherwise be imposed on the Bureau.

V

Remedies

A. Declaratory Relief

Based on the foregoing analyses, we declare the fee schedule formulas set forth in regulations 1066 and 1073 unconstitutional and invalid. To avoid serious disruptions of the work of the Division, on remand the superior court shall issue an order staying further proceedings before the SWRCB or BOE and otherwise maintaining the fee schedule formula as presently interpreted and implemented by the SWRCB, such *470 order to remain in effect until the SWRCB adopts new fee schedule formulas in accordance with the views expressed in this analysis. However, the SWRCB must correct the deficiencies and adopt new fee schedule formulas within 180 days of the finality of this opinion. (See Morning Star Company v. State Board of Equalization (2006) 38 Cal.4th 324, 340-342, 42 Cal. Rptr.3d 47,132 P.3d 249.)

B. Refunds of Annual Fees

The fee adjustment authorized by section 1525, subdivision (d)(3) provides an adequate mechanism to compensate annual fee payers when the SWRCB collects more revenue than required under the Budget Act to cover the Division's costs. Our challenge is to construct a remedy to refund fees, if any, that were unlawfully imposed on individual permit and license holders and federal contractors under the fiscal year 2003-2004 fee schedule formulas set forth in regulations 1066 and 1073. We are mindful that any disruption in the collection of annual fees would seriously undermine the Division's program. We are also aware of the need to provide a simple and accessible refund process for individual fee payers within the existing statutory and regulatory structure. We requested and received supplemental briefing from the parties on the remedies available.
The procedure for challenging the fees bears on the remedy available. As we explained, the SWRCB contracts with the BOE to collect and refund annual fees.[25] Sections 1126 and. 1537 and regulations 1074 and 1077 limit the BOE's typical role under the Fee Collection Procedures Law (Rev. & Tax.Code, §§ 55001 et seq.) Thus it is for the SWRCB, not the BOE, to determine whether "a person or entity is required to pay a fee" and whether the amount of the fee was incorrectly calculated. (Cal.Code Regs., tit. 23, § 1077, subd .(c).) Although the SWRCB lacks power to rule a statute unconstitutional or unenforceable unless an appellate court has made that determination (Cal. Const., art III, § 3.5), the SWRCB advises that the California Constitution "does not prohibit a party from raising a constitutional issue as part of [a] petition challenging a decision or order applying the statute, however, and any constitutional issues should be raised before the administrative agency if a party wants to preserve those issues for judicial review." Review is by writ of mandate in the superior court, not by petition for redetermination by the BOE. (§ 1537, subd. (b)(2).) However, persons or entities seeking refunds must first exhaust their remedies before the SWRCB: "A person may not maintain a suit in any court for the recovery of a fee assessed by the State Board of Equalization unless the person has filed a petition for reconsideration in accordance with this chapter and has either paid the fee in accordance with subdivision (d) or pays the fee within 30 days of the issuance of a reassessment of the fee pursuant to subdivision (h). The petition and payment of the fee in accordance with this subdivision constitute a claim for refund within the meaning of section 55242 of the Revenue and Taxation Code." (Cal.Code Regs., tit. 23, § 1074, subd. (j), as added in Register 2004, No. 42 (Oct. 14, 2004).) The BOE is authorized to accept a refund claim only after the SWRCB or a reviewing court has set the fee determination aside. (§ 1537, subd. (b)(3).)
Because this court has declared unconstitutional and invalid the fee schedule formulas set forth in regulations 1066 and 1073, the BOE is authorized to accept refund *471 claims from persons or entities who filed petitions for reconsideration with the SWRCB. However, in addition to staying further proceedings before the SWRCB and BOE, and directing the SWRCB to adopt new fee schedule formulas for fiscal year 2003-2004, on remand the trial court shall direct the SWRCB to utilize the recalculated fee schedule formula and determine if refunds are due to persons and entities who paid annual fees and filed petitions for reconsideration under the invalid fee schedule formula. The SWRCB shall provide the refund formula to the BOE for refund to the aforementioned parties with interest within 180 days of the finality of this opinion.

DISPOSITION
The judgment denying plaintiffs' petition for writ of mandate is reversed in part. The fee schedule formulas set forth in California Code of Regulations, title 23, regulations 1066 and 1073 are declared unconstitutional and invalid. The cause is remanded to the superior court with directions to: (1) stay further proceedings before the SWRCB and/or BOE until the SWRCB adopts new fee schedule formulas and a procedure for calculating refunds if any; (2) order the SWRCB to adopt valid fee schedule formulas within 180 days of the finality of this opinion; (3) order the SWRCB to determine the amount of annual fees improperly assessed under regulations 1066 and 1073 for the 2003-2004 fiscal year and establish a procedure for calculating refunds, if any, due within 180 days of the finality of this opinion; and (4) order the Board of Equalization, through the SWRCB, to refund any annual fees unlawfully collected to fee payers who filed timely petitions for reconsideration with the SWRCB and/or are subject to the January 20, 2004, stipulation between the NCWA, CVPWA, SWRCB and BOE. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.276.)
We concur: BLEASE, Acting P.J, and SIMS, J.

*472 APPENDIX

NOTES
[1] Proposition 13 was adopted by the voters in the June 6, 1973 primary election. (2A West's Ann. Cal. Const. (1996 ed.) foll. art. 13A, § 1, p. 477; Ballot Pamp., Primary Elec. (June 6, 1978), p. 56.)

We grant the unopposed requests for judicial notice filed by the SWRCB on January 19, 2006, and March 10, 2006, and by the Northern California Water Association (NCWA) and the Central Valley Project Water Association (CVPWA) on February 9, 2006. (Evid.Code, §§ 452, subds.(b) & (c), 459, subd. (a).) We also take judicial notice of trial court documents attached to the letter brief filed by the NCWA and CVPWA on August 11, 2006. (Evid.Code, §§ 452, subd. (d), 459, subd. (a).)
[2] The Legislature enacted Water Code sections 1525, 1540 and 1560 as part of Senate Bill No. 1049. (Stats.2003, ch. 741, § 85.)

Hereafter, undesignated statutory references are to the Water Code.
[3] See Appendix.
[4] In its opening brief, the Farm Bureau refers to pueblo rights along with riparian rights. "The pueblo water right ... is the paramount right of an American city as successor of a Spanish or Mexican pueblo (municipality) to the use of water naturally occurring within the old pueblo limits for the use of the inhabitants of the city." (Hutchins, The California Law of Water Rights (1956) p. 256.) In California, the cities of Los Angeles and San Diego hold pueblo water rights. (Ibid.)
[5] See Appendix.
[6] See Appendix.
[7] See Appendix.
[8] See Appendix.
[9] See Appendix. An acre-foot is "[t]he volume of water, 43,560 cubic feet, that will cover an area of one acre to a depth of one foot." (American Heritage Diet. (2d college ed.1982, 1985) p. 75.)
[10] "Usufructuary" relates to a "usufruct" which is "[a] right to use another's property for a time without damaging or diminishing it...." (Black's Law Diet. (7th ed.1999), pp. 1542, 1543.)
[11] Section 1540 reads in part: "The allocation of the fee or expense to these contractors does not affect ownership of any permit, license, or other water right, and does not vest any equitable title in the contractors."
[12] Section 1525 reads in its entirety: "(a) Each person or entity who holds a permit or license to appropriate water, and each lessor of water leased under Chapter 1.5 (commencing with Section 1020) of Part 1, shall pay an annual fee according to a fee schedule established by the board.

"(b) Each person or entity who files any of the following shall pay a fee according to a fee schedule established by the board:
"(1) An application for a permit to appropriate water.
"(2) A registration of appropriation for a small domestic use or livestock stockpond.
"(3) A petition for an extension of time within which to begin construction, to complete construction, or to apply the water to full beneficial use under a permit.
"(4) A petition to change the point of diversion, place of use, or purpose of use, under a permit or license.
"(5) A petition to change the conditions of a permit or license, requested by the permittee or licensee, that is not otherwise subject to paragraph (3) or (4).
"(6) A petition to change the point of discharge, place of use, or purpose of use, of treated wastewater, requested pursuant to Section 1211.
"(7) An application for approval of a water lease agreement.
"(8) A request for release from priority pursuant to Section 10504.
"(9) An application for an assignment of a state-filed application pursuant to Section 10504.
"(c) The board shall set the fee schedule authorized by this section so that the total amount of fees collected pursuant to this section equals that amount necessary to recover costs incurred in connection with the issuance, administration, review, monitoring, and enforcement of permits, licenses, certificates, and registrations to appropriate water, water leases, and orders approving changes in point of discharge, place of use, or purpose of use of treated wastewater. The board may include, as recoverable costs, but is not limited to including, the costs incurred in reviewing applications, registrations, petitions and requests, prescribing terms of permits, licenses, registrations, and change orders, enforcing and evaluating compliance with permits, licenses, certificates, registrations, change orders, and water leases, inspection, monitoring, planning, modeling, reviewing documents prepared for the purpose of regulating the diversion and use of water, applying and enforcing the prohibition set forth in Section 1052 against the unauthorized diversion or use of water subject to this division, and the administrative costs incurred in connection with carrying out these actions.
"(d)(1) The board shall adopt the schedule of fees authorized under this section as emergency regulations in accordance with Section 1530...." [¶] ... [¶]
"(3) The board shall set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the revenue levels set forth in the annual Budget Act for this activity. The board shall review and revise the fees each fiscal year as necessary to conform with the revenue levels set forth in the annual Budget Act. If the board determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the annual Budget Act, the board may further adjust the annual fees to compensate for the over or under collection of revenue.
"(e) Annual fees imposed pursuant to this section for the 2003-04 fiscal year shall be assessed for the entire 2003-04 fiscal year."
[13] Section 1122 provides: "The board may order a reconsideration of all or part of a decision or order on the board's own motion or on the filing of a petition of any interested person or entity. The petition shall be filed not later than 30 days from the date the board adopts a decision or order. The authority of the board to order a reconsideration on its own motion shall expire 30 days after it has adopted a decision or order. The board shall order or deny reconsideration on a petition therefor not later than 90 days from the date the board adopts the decision or order."

Section 1123 defines the scope of a petition for reconsideration: "The decision or order may be reconsidered by the board on all the pertinent parts of the record and such argument as may be permitted, or a further hearing may be held, upon notice to all interested persons, for the purpose of receiving such additional evidence as the board may, for cause, allow. The decision or order on reconsideration shall have the same force and effect as an original order or decision."
[14] Section 1126 reads in part:

"(a) It is the intent of the Legislature that all issues relating to state water law decided by the board be reviewed in state courts, if a party seeks judicial review. It is further the intent of the Legislature that the courts assert jurisdiction and exercise discretion to fashion appropriate remedies pursuant to Section 389 of the Code of Civil Procedure to facilitate the resolution of state water rights issues in state courts.
"(b) Any party aggrieved by any decision or order may, not later than 30 days from the date of final action by the board, file a petition for a writ of mandate for review of the decision or order. Except in cases where the decision or order is issued under authority delegated to an officer or employee of the board, reconsideration before the board is not an administrative remedy that is required to be exhausted before filing a petition for writ of mandate...."
[15] Senate Bill No. 1049 amended former section 1540 and now reads:

"If the board determines that the person or entity on whom a fee or expense is imposed will not pay the fee or expense based on the fact that the fee payer has sovereign immunity under Section 1560, the board may allocate the fee or expense, or an appropriate portion of the fee or expense, to persons or entities who have contracts for the delivery of water from the person or entity on whom the fee or expense was initially imposed. The allocation of the fee or expense to these contractors does not affect ownership of any permit, license, or other water right, and does not vest any equitable title in the contractors." (Stats.2003, ch. 741, § 85, pp. 60-61.) Senate Bill No. 1049 amended former section 1560 and now reads:
"(a) The fees and expenses established under this chapter and Part 3 (commencing with Section 2000) apply to the United States and to Indian tribes, to the extent authorized under federal or tribal law.
"(b) If the United States or an Indian tribe declines to pay a fee or expense, or the board determines that the United States or the Indian tribe is likely to decline to pay a fee or expense, the board may do any of the following:
"(1) Initiate appropriate action to collect the fee or expense, including any appropriate enforcement action for failure to pay the fee or expense, if the board determines that federal or tribal law authorizes collection of the fee or expense.
"(2) Allocate the fee or expense, or an appropriate portion of the fee or expense, in accordance with Section 1540. The board may make this allocation as part of the emergency regulations adopted pursuant to Section 1530.
"(3) Enter into a contractual arrangement that requires the United States or the Indian tribe to reimburse the board, in whole or in part, for the services furnished by the board, either directly or indirectly, in connection with the activity for which the fee or expense is imposed.
"(4) Refuse to process any application, registration, petition, request, or proof of claim for which the fee or expense is not paid, if the board determines that refusal would not be inconsistent with federal law or the public interest." (Stats.2003, ch. 741, § 85, p. 62, italics added.)
[16] Section 1525 et seq. and emergency regulations became effective January 1, 2004, halfway through the 2003-2004 fiscal year. (Stats. 2003, ch. 741, § 85, p. 1; Cal. Const., art. IV, § 8, subd. (c); Cal.Code Regs., tit. 23, §§ 1061-1078, Register 2003, No. 52 (Dec. 23, 2003).) The General Fund covered the cost of the water rights program for the first half of fiscal 2003-2004, approximately $4.6 million in a budget of approximately $9 million.
[17] The stipulation also states: "The Parties agree that should Plaintiffs prevail in this litigation, the Parties named in the Amended Complaint will be entitled to a refund of paid fees in a manner and to the extent this is consistent with the decision of the Court after the exhaustion of all appeals."
[18] Government Code section 50076 applies to local agencies and states that "[a]s used in this article, `special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."
[19] Section 1551 provides: "All of the following shall be deposited in the Water Rights Fund:

"(a) All fees, expenses, and penalties collected by the board or the State Board of Equalization under this chapter and Part 3 (commencing with Section 2000).
"(b) All funds collected under Section 1052, 1845, or 5107. "(c) All fees collected under Section 13160.1 in connection with certificates for activities involving hydroelectric power projects subject to licensing by the Federal Energy Regulatory Commission."
[20] Section 1552 provides:

"The money in the Water Rights Fund is available for expenditure, upon appropriation by the Legislature, for the following purposes:
"(a) For expenditure by the State Board of Equalization in the administration of this chapter and the Fee Collection Procedures Law (Part 30 (commencing with Section 55001) of Division 2 of the Revenue and Taxation Code) in connection with any fee or expense subject to this chapter.
"(b) For the payment of refunds, pursuant to Part 30 (commencing with Section 55001) of Division 2 of the Revenue and Taxation Code, of fees or expenses collected pursuant to this chapter.
"(c) For expenditure by the board for the purposes of carrying out this division, Division 1 (commencing with Section 100), Part 2 (commencing with Section 10500) of Division 6, and Article 7 (commencing with Section 13550) of Chapter 7 of Division 7.
"(d) For expenditures by the board for the purposes of carrying out Sections 13160 and 13160.1 in connection with activities involving hydroelectric power projects subject to licensing by the Federal Energy Regulatory Commission.
"(e) For expenditures by the board for the purposes of carrying out Sections 13140 and 13170 in connection with plans and policies that address the diversion or use of water."
[21] The SWRCB cites the $4,399,000 listed in the 2003-2004 Budget Act (Stats.2003, ch. 157, schedule 21.5 [item XXXX-XXX-XXXX], p. 235) in support of its argument the fees do not exceed the cost of the regulatory program. This, amount, however, does not state the total amount from the "activity" referred to in section 1525, subdivisions (a), (b) and (c). That is because the amount for the "activity" of issuing permits and the like are contained within item XXXX-XXX-XXXX (the $4,399,000) by virtue of the somewhat peculiar way in which the budget is enacted.

The budget enactment consists of two parts, the summary of total amounts allocated by items, as shown in the Budget Act in item XXXX-XXX-XXXX cited by the SWRCB, and the supporting data that is contained in a document that accompanies the Budget Act that spells out the detail under each of the items listed in the Budget Act. These data are taken from the Governor's budget, a detailed accounting that includes all of the detailed functions and the employee positions required to carry them out, as modified by the Legislature. The document containing the detail of item XXXX-XXX-XXXX is not in the record and hence we do not know the specific "revenue level" for "the fees authorized by" section 1525, subdivision (d)(3). That is, the SWRCB has not supplied the evidence from which the amounts allocated to the functions or activities set forth in subdivisions (a) through (c) can be calculated.
[22] See Appendix.
[23] See computation of the federal contractors' annual fees at pages 457 to 458, ante.
[24] Federal cases make no distinction between fees and taxes for purposes of Supremacy Clause analysis because "both have their common source in the sovereign power of taxation." (See United States v. Anderson Cottonwood Irrigation Dist. (N.D.Cal.1937) 19 F.Supp. 740, 741.)
[25] See pages 454-455, ante.