Filed 3/2/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NORTHERN CALIFORNIA WATER ASSOCIATION et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>STATE WATER RESOURCES CONTROL BOARD et al.,<br><br>Defendants and Appellants. | C075866<br><br>(Super. Ct. No. 03CS01776) |
| CALIFORNIA FARM BUREAU FEDERATION et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>STATE WATER RESOURCES CONTROL BOARD et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. 04CS00473) |

APPEAL from a judgment of the Superior Court of Sacramento County, Raymond M. Cadei, Judge. Reversed.

Kamala D. Harris and Xavier Becerra, Attorneys General, Kathleen A. Kenealy Acting Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Eric M. Katz, Helen G. Arens, and Carol A. Z. Boyd, Deputy Attorneys General, for Defendants and Appellants.

Somach Simmons & Dunn, Stuart L. Somach, Daniel Kelly, Robert B. Hoffman, Brittany K. Lewis-Roberts, and Lauren D. Bernadett for Plaintiffs and Respondents.


This appeal involves challenges to the State Water Resources Control Board's (Board) imposition of a new annual fee on water right permit and license holders in fiscal year 2003-2004 to cover a portion of the costs of the Board's Division of Water Rights (Division or Water Rights Division).

In 2003, the Legislature enacted Water Code[1] section 1525, which requires the holders of permits and licenses to appropriate water to pay an annual fee according to a fee schedule established by the Board. (§ 1525, subd. (a).) At the same time, the Legislature enacted sections 1540 and 1560, which allow the Board to allocate the annual fee imposed on a permit or license holder who refuses to pay the fee on sovereign immunity grounds to persons or entities who contracted for the delivery of water from that permit or license holder.

To implement section 1525's fee requirement, the Board adopted California Code of Regulations, title 23, sections 1066 and 1073 (regulation 1066 & regulation 1073). Regulation 1066 sets forth a fee formula for permit and license holders. Regulation 1073 sets forth a formula for allocating the annual fee "for projects within the Central Valley

---

[1] Further undesignated statutory references are to the Water Code.

Project" (CVP) when the Board determines that the United States Bureau of Reclamation (USBR), which operates the CVP, will not pay the fee.  (Regulation 1073, subd. (b).)

Plaintiffs Northern California Water Association, California Farm Bureau Federation, and individual fee payors claimed that the annual fee imposed in fiscal year 2003-2004 constituted an unlawful tax, as opposed to a valid regulatory fee, under article XIII A, section 3, of the California Constitution (Proposition 13)[2] because it required fee payors to pay more than a de minimis amount for regulatory activities that benefited non-fee-paying right holders.  Plaintiffs also claimed that the fees allocated to the water supply contractors violated the supremacy clause of the United States Constitution because they exceeded the contractors' beneficial interests in the USBR's water rights.

Our Supreme Court has already ruled that sections 1525, 1540, and 1560 are constitutional on their face.  (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 428 (*Farm Bureau II*).)  The court, however, found that the record was unclear as to (1) "whether the fees were reasonably apportioned in terms of the regulatory activity's costs and the fees assessed," and (2) "the extent and value of the [contractors' beneficial] interests."  (*Id.* at p. 428.)  Accordingly, the court directed this court to remand the matter to the trial court to make findings on those issues.  (*Ibid.*)

Following a 10-day bench trial, the trial court issued a statement of decision that determined inter alia that the statutory scheme as applied through its implementing regulations imposed a tax, as opposed to a valid regulatory fee, by allocating the entire cost of the Division's regulatory activities to permit and license holders, while non-paying-water-right holders who benefit from and place burdens on the Division's

---

[2] California Constitution, article XIII A, section 3, was originally approved by initiative as Proposition 13, on June 6, 1978.

3

activities pay nothing.[3]  The trial court likewise found that the fees passed through to the water supply contractors in fiscal year 2003-2004 pursuant to regulation 1073 ran afoul of the supremacy clause "because the allocation of fees [was] not limited to the contractors' beneficial or possessory use of the [USBR's] water rights."  In addition, the trial court found that the fee regulations were invalid because they operated in an arbitrary manner as to a single payor, Imperial Irrigation District.  Accordingly, the trial court invalidated regulations 1066 and 1073, "as adopted by Resolution 2003-0077 in 2003-2004."[4]

The Board appeals, contending the trial court erred in invalidating the fee regulations.

We shall conclude that the trial court's central premise -- that the Board allocated the entire cost of the Division's regulatory activities to permit and license holders -- is wholly incorrect because it fails to recognize the role that general fund money played in fiscal year 2003-2004.  That year the Legislature appropriated roughly $9 million dollars for the Water Rights Division, roughly 51 percent of which was paid from the Water Rights Fund (fee revenue), while 43 percent was paid from the state's general fund, and 6 percent from reimbursements and other funds.  Moreover, the record shows that roughly 90 percent of the Division's costs were attributable to permit and license holders, while 10 percent were attributable to non-fee-paying right holders.  Thus, the fees assessed on

---

[3]  At the remand trial, the parties and trial court agreed that the Supreme Court had directed the trial court to make findings concerning "[t]he fee structure and the administrative actions taken as of 2003 and 2004, not the current state of affairs." Accordingly, the trial court limited its findings and the judgment to the fee regulations "as adopted by Resolution 2003-0077 in 2003-2004."

[4]  The trial court also invalided regulation 1071, which sets forth a fee formula for activities involving the diversion or use of water for the purpose of diverting water for hydropower generation.  (Cal. Code Regs., tit. 23, § 1071.)

permit and license holders were proportionate to the benefits derived by them or the burdens they placed on the Division. Plaintiffs' assertion that the water right fee was imposed for the second half of the fiscal year is at odds with the evidence and the language of section 1525, subdivision (e), which provides that the fees "imposed pursuant to this section for the 2003-04 fiscal year shall be assessed *for the entire 2003-04 fiscal year,*" and section 1552, which states that "moneys in the Water Rights Fund are available for expenditure, *upon appropriation* by the Legislature." (Italics added.)

We shall further conclude that the Board's decision to allocate all of the USBR's annual fee for projects within the CVP to the water supply contractors was reasonable. The record and the case law establish that the USBR provides the contractors with all available water after satisfying its obligations under state and federal law. Because the CVP contractors received everything the USBR had to give under its CVP permits and licenses, the Board reasonably valued the CVP contractors' beneficial interest in those permits and licenses at 100 percent. Finally, we shall conclude that the trial court erred in determining that the fee regulations were invalid based on their application to a single payor. Accordingly, we shall reverse the judgment invalidating the fee regulations.

"The water in California belongs to the people, but the right to use water may be acquired as provided by law." (*Farm Bureau II, supra,* 51 Cal.4th at p. 428, citing §§ 102, 1201, italics omitted.) The Board is responsible for the "orderly and efficient administration of the water resources of the state" and exercises "the adjudicatory and regulatory functions of the state in the field of water resources." (§ 174, subd. (a).) The Water Rights Division administers the water rights program, but its authority is limited. (*Farm Bureau II, supra,* 51 Cal.4th at pp. 429-430.) The Board regulates all appropriative water rights[6] acquired since 1914 through a system of permits and licenses.

---

[5]     Plaintiffs moved to strike portions of the Board's opening brief on the ground that the brief "cites to and relies on materials, as substantive evidence, that were not before the Trial Court." Having deferred ruling on the motion pending assignment of a panel and filing of the opinion in this court, we now deny it. All of the materials that are the subject of the motion to strike are from the appendix for the prior appeal in this case, which, in turn, are from the original trial court writ proceedings. As the trial court acknowledged, the remand trial was not a "separate trial," it was a "further trial" on the writ. Moreover, California Rules of Court, rule 8.124(b)(2) provides that "[a]n appendix may incorporate by reference all or part of the record on appeal . . . in a prior appeal in the same case." It also bears noting that while plaintiffs' motion to strike addresses several items, the focus of the motion is on one document, an April 15, 2004, letter from Arthur G. Baggett, Jr., to Assemblymember Joseph Canciamilla (Baggett Letter). As the Board correctly notes in its opposition to the motion to strike, the Board does not rely on the Baggett Letter as substantive evidence in its opening brief. And we have not considered the Baggett Letter for any purpose in resolving the issues raised in this appeal.

Plaintiffs also moved to strike portions of the Board's supplemental letter brief. We shall deny the motion as moot because we did not rely on either parties' supplemental briefs in determining the issues raised in this appeal.

[6]     An appropriative right is the right to take water from a watercourse that does not run adjacent to a landowner's property. (*Farm Bureau II, supra,* 51 Cal.4th at p. 429.)

(*Id.* at p. 429.) It does not have jurisdiction to regulate riparian,[7] pueblo,[8] and pre-1914 appropriative rights (RPP right). (*Id.* at p. 429.) It does, however, "have authority to prevent illegal diversions and to prevent waste or unreasonable use of water, regardless of the basis under which the right is held." (*Ibid.*; see also § 275.) At all relevant times herein, RPP right holders accounted for approximately 38 percent of all surface water rights, the USBR accounted for 22 percent, and permit and license holders (other than the USBR) accounted for 40 percent.

Prior to fiscal year 2003-2004, the operation of the Water Rights Division was supported primarily by the state's general fund, with less than one percent of Division costs covered by fees. The Governor's budget proposal for fiscal year 2003-2004 proposed expenditures of $8.7 million to support the water rights program, $7.2 million of which was to be payable from the general fund. In its analysis of the fiscal year 2003-2004 budget bill, the Legislative Analyst's Office (LAO) recommended that general fund support for the water rights program be *fully* replaced with "a new annual compliance fee assessed on all water rights holders under the board's jurisdiction." The Board opposed the LAO's recommendation, arguing that the LAO's analysis incorrectly assumed that "all water right actions benefit . . . the regulated community (water right permit and license holders)" and failed to take into account water-right holders outside of the Board's jurisdiction who also benefit from the Division's activities but would not be assessed a fee (i.e., RPP right holders).

---

[7] "Under the common law riparian doctrine, a person owning land bordering a stream has the right to reasonable and beneficial use of water on his or her land." (*Farm Bureau II, supra,* 51 Cal.4th at p. 429, fn. 7.)

[8] " 'A pueblo water right . . . is the paramount right of an American city as successor of a Spanish or Mexican pueblo (municipality) to the use of water naturally occurring within the old pueblo limits for use of the inhabitants of the city.' " (*Farm Bureau II, supra,* 51 Cal.4th at p. 429, fn. 8.)

The final budget act, which took effect on August 2, 2003, appropriated roughly $9 million for the Water Rights Division, $4.4 million of which was payable from the Water Rights Fund, which had yet to be established. The final change book to the Governor's fiscal year 2003-2004 budget stated in pertinent part: "Adopt trailer bill language to establish an annual water right fee. Fee revenues would be deposited in the newly created Water Rights Fund and used to offset General Fund expenditure *reductions*." (Italics added.)

In September 2003, the Legislature passed Senate Bill No. 1049 (2003-2004 Reg. Sess.) (Senate Bill 1049) by a simple majority (53 percent). (Stats. 2003, ch. 741, p. 5549 et seq.) Senate Bill 1049 was signed by the Governor on October 8, 2003, and took effect on January 1, 2004. Senate Bill 1049 repealed certain sections of the Water Code and enacted sections 1525 through 1560, which among other things, imposed an annual fee on water right permit and license holders (§ 1525) and established the Water Rights Fund (§§ 1550 & 1551).

As relevant here, section 1525, subdivision (a) requires water right permit and license holders to pay an annual fee according to a fee schedule established by the Board.[9] Subdivision (c) of section 1525 requires the Board to set the fee schedule "so that the total amount of fees collected pursuant to this section equals that amount necessary to recover costs incurred in connection with" the Division's activities.[10] Subdivision (d)(1) of section 1525 directs the Board to adopt the fee schedule as emergency regulations in accordance with section 1530, while former subdivision (d)(3) required the Board to "set the amount of total revenue collected each year through the

---

[9]    Subdivision (b) of section 1525 sets forth a series of mandatory filing fees. Those fees are not at issue in this appeal.

[10]    Subdivision (c) of section 1525 sets out "recoverable costs" in substantial detail, but the costs recoverable are "not limited to" the activities identified.

fees authorized by this section at an amount equal to the revenue levels set forth in the annual Budget Act for this activity."[11] Finally, subdivision (e) of section 1525 specifies that "[a]nnual fees imposed pursuant to this section for the 2003-04 fiscal year shall be assessed for the entire 2003-04 year."

Section 1540 allows the Board to allocate the annual fee (or a portion thereof) of a person or entity who refuses to pay it based on sovereign immunity to persons or entities who have contracts for the delivery of water from the person or entity upon whom the fee was initially imposed. Section 1560 sets out the options that may be pursued when the United States or an Indian tribe declines to pay the annual fee by relying on sovereign immunity.

Sections 1550 and 1551 establish the Water Rights Fund into which all fees, expenses, and penalties collected by the Board must be deposited. Section 1552 sets forth the purposes for which the money in the Water Rights Fund may be used and provides that such funds are available for expenditure "upon appropriation by the Legislature."

To establish a fee schedule as directed in section 1525, the Board began with the $4.4 million figure set forth in the fiscal year 2003-2004 budget -- the amount of the Division's $9 million budget that was to be paid from the Water Rights Fund. The Board determined that most of the fee revenue should come from annual fees because it believed that annual fees would provide a more stable funding source, and most of the Division's work is related to overseeing and protecting water rights.

---

[11]     Subdivision (d)(3) was amended in 2011. As amended, it provides that the Board "shall set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the amounts appropriated by the Legislature for expenditure for support of water rights program activities from the Water Rights Fund established under Section 1550, taking into account the reserves in the Water Rights Fund." (Stats. 2011, ch. 579, § 9.)

The Board assumed that 40 percent of permit and license holders would not pay the annual fee because 40 percent of permit and license holders failed to comply with the existing mandatory reporting requirements. To account for the estimated 40 percent noncollection rate, the Board divided $4.4 million by 0.60, which generated a revised billing target of over $7 million.

The Board elected to apportion the fees among permit and license holders based on the face value of their permits and licenses, i.e., the total annual amount of diversion authorized by the permit or license,[12] reasoning that the more water held under a permit or license, the greater the regulatory burden to the Division because larger projects generally have greater environmental impacts, involve more controversial issues, and affect a greater number of people. The Board elected not to base the fees on the water actually used because it did not have complete or reliable records concerning actual water used. As previously noted, only 60 percent of permit and license holders complied with annual reporting requirements, and the Board had no way of accurately monitoring use. The Board also rejected a fee-for-service approach as too costly, beyond the capability of its accounting system, and unpredictable.

The Board reduced the face value of the permits and licenses for hydroelectric projects because the Division expends fewer resources administrating those water

---

[12] More precisely, the face value of a permit is the amount of water the applicant has estimated it can put to beneficial use, including reasonable conveyance losses (Cal. Code Regs., tit. 23, § 696), while the face value of a license--the perfected water right--is the amount of water the Board has determined the licensee was able to put to beneficial use (§ 1610).

10

rights.[13]  As a result of these reductions, the face value of all water right permits and licenses was reduced from 322 million to 200 million acre-feet.

After running several calculations, the Board set annual fees at the greater of $100 or $0.03 per acre-foot based on the face value of the permit or license.[14]

The Board used the same methodology for calculating the USBR's annual water right fee as it did for other permit and license holders.  The face value of all the USBR permits and licenses was 116 million acre-feet.  After adjustments for hydropower, the face value of the USBR's permits and licenses was reduced to 86 million acre-feet, which in fiscal year 2003-2004 amounted to an annual fee of roughly $2.58 million (86 million acre-feet multiplied by $0.03).

Once the Board determined that the USBR would not pay the fee based on sovereign immunity, the Board elected to allocate the portion of the USBR's fee attributable to its CVP permits and licenses, 81.7 million acre-feet, to the CVP contractors.  (§§ 1540, 1560, subd. (b)(2).)  The 81.7 million-acre feet amounted to $2.45 million in annual fees (81.7 million acre-feet multiplied by $0.03).  The Board divided the $2.45 million among the projects within the CVP according to each project's water rights, and using records provided by the USBR, the Board grouped the CVP contractors by the project serving them.  It then assessed the CVP contractors a prorated share of the

---

[13]  The face value of permits and licenses for projects licensed by the Federal Energy Regulatory Commission (FERC) was reduced by 70 percent, and the face value of permits and licenses for non-FERC projects was reduced by 50 percent.

[14]  The Board also imposed one-time filing fees on applications for new permits and licenses and petitions to change terms and conditions of existing permits and licenses. (See Cal. Code Regs., tit. 23, §§ 1062, 1064.)  It assumed that filing fees would generate $207,400 annually, which correspondingly reduced the amount of revenue to be assessed through annual fees.

amount of fees associated with the projects serving them, based on the amount of water specified in their contracts.

To implement the fee schedule as directed in section 1525, the Board adopted regulation 1066 and regulation 1073. Regulation 1066 applies to water right permit and license holders. Regulation 1066, former subdivision (a), provided: "A person who holds a water right permit or license shall pay an annual fee that is the greater of $100 or $0.03 per acre-foot based on the total annual amount of diversion authorized by the permit or license." (Reg. 1066, subd. (a), Register 2003, No. 52 (Dec. 23, 2003).)

The Board adopted regulation 1073 to implement sections 1540 and subdivision (b)(2) of section 1560, which among other things, authorized the Board to allocate an annual fee imposed on the United States to persons or entities who contract with the United States for the delivery of water when the United States declines to pay the annual fee based on sovereign immunity. As relevant here, regulation 1073 provides that if the USBR declines or is likely to decline to pay fees or expenses for projects within the CVP, the Division Chief shall allocate those fees or expenses to the USBR's water supply contractors. (Regulation 1073, subd. (b)(2).) The regulation further provides that "[t]he fee or expense for projects of the [CVP] shall be prorated among the contractors for the [CVP] based on either the contractor's entitlement under the contract or, if the contractor has a base supply under the contract, the contractor's supplemental supply entitlement."[15] (Regulation 1073, subd. (b)(2).)

_____

[15]   " 'Base supply' means the amount of water delivered to a water user by USBR from the Central Valley Project that is designated as base supply in a water supply contract between the user and the USBR." (Regulation 1073, subd. (e)(1).) " 'Supplemental supply entitlement' means the amount of water exceeding base supply delivered from the Central Valley Project to a water user." (Regulation 1073, subd. (e)(2).)

In January 2004, the Board of Equalization[16] sent fee notices to water right permit and license holders and to those who contracted with the USBR for the delivery of CVP water.  (§§ 1536 & 1537, subd. (a).)  The Division collected nearly $7.4 million in fees but expended just over $4.6 million of that amount.  The remainder was deposited into a new fund and became the starting balance of the Water Rights Fund for the next fiscal year.

The Division's actual adjusted operational costs and funding sources for fiscal year 2003-2004 were as follows:

| WATER RIGHTS | |
|---|---|
| State Operations | |
| General Fund | $3.865* |
| Public Resources Account, Cigarette and Tobacco Products Sales Tax | $0.355 |
| Federal Trust Fund | $0.150 |
| Reimbursements | $0.088 |
| Water Rights Fund | $4.608 |
| **Totals, State Operations** | **$9.066** |

* Dollars in millions

Roughly 51 percent of the Division's costs were paid from the Water Rights Fund, while 43 percent were paid from the state's general fund, and 6 percent from reimbursements and other funds.

Plaintiffs challenged the imposition of the annual water right fee, seeking declaratory and injunctive relief and a writ of mandate.  They alleged that the statutory scheme enacted by the Legislature was unconstitutional on its face and "as applied" through the emergency regulations adopted by the Board.  The trial court initially denied the writ of mandate, ruling that the money collected constituted valid regulatory fees, rather than taxes.  It also rejected plaintiffs' other constitutional claims.

---

[16]     The Board of Equalization has since been reorganized and for purposes of this appeal is now the California Department of Tax and Fee Administration.

13

We reversed in part, holding that the statutory scheme was constitutional on its face, but that it was unconstitutional as applied through the fee formulas set forth in the emergency regulations. (*California Farm Bureau Federation v. California State Water Resources Control Bd.* (2007) 146 Cal.App.4th 1126, 1132 (*Farm Bureau I*).) We therefore remanded the matter to the trial court with instructions to order the Board to adopt valid fee formulas. (*Id.* at pp. 1160-1161.)

Our Supreme Court affirmed our judgment holding that the statutory scheme was constitutional on its face, but reversed our determination that the statutes were unconstitutional as applied through the regulations. (*Farm Bureau II, supra,* 51 Cal.4th at p. 428.) The court found that the record was inadequate and that the trial court's order lacked sufficient factual findings and remanded the matter to this court with directions to remand the matter to the trial court to make additional findings. (*Id.* at pp. 428, 437, 441-442, 446-447.)

Following a 10-day bench trial, the trial court issued a statement of decision that concluded inter alia that "the statutory scheme and its implementing regulations improperly require the permit and license holders to pay more than a de minimis amount for regulatory activities that benefit non-paying water right holders, or that result from burdens non-paying water right holders placed on the Water Rights Division" and therefore must be invalidated. The court also determined that plaintiffs "demonstrated that the allocation of the [USBR's] fees to [CVP] contractors is unconstitutional under the supremacy clause, because the allocation of fees is not limited to the contractors' beneficial or possessory use of the [USBR's] water rights." The Supreme Court's decision in *Farm Bureau II* and the trial court's findings on remand are set forth in more detail below in the discussion of the Board's claims on appeal.

14

DISCUSSION

I

The Trial Court Erred in Determining That the Water Right Fee Imposed in Fiscal Year 2003-2004 Pursuant to Regulation 1066 Was Not Properly Allocated, and Thus, Constituted an Unlawful Tax

The trial court determined that the annual water right fee imposed in fiscal year 2003-2004 operated as a tax, not a valid regulatory fee, because "the evidence establishes that the statutory scheme and its implementing regulations do not provide a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors." The trial court's determination is predicated on its finding that "the statutory scheme and its implementing regulations improperly require the permit and license holders to pay more than a de minimis amount for regulatory activities that benefit [RPP] right holders, or that result from burdens [RPP] right holders place on the Water Rights Division."

The Board does not dispute that RPP right holders were not assessed any water right fees even though they benefited from and placed burdens on the Division's activities. Rather, the Board claims that the trial court ignored substantial evidence in the record that established that only 10 percent of the Division's costs were attributable to RPP right holders, and that there was more than enough "non-fee" support for the Division to cover such costs. According to the Board, had the trial court considered such evidence, it would have concluded that holders of permits and licenses were not required to pay for costs attributable to RPP right holders. The Board therefore contends that the trial court erred in determining that the statutory scheme and its implementing regulations do not provide a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors. The Board is correct.

A.   *Applicable Law*

"The California Constitution provides that any act to increase taxes must be passed by a two-thirds vote of the Legislature. On the other hand, statutes that create or raise

15

regulatory fees need only the assent of a simple majority." (*Farm Bureau II, supra,* 51 Cal.4th at p. 428, fns. omitted.) Senate Bill 1049 "passed the Legislature with only a 53 percent majority. Thus, if the amount charged under section 1525 [(as applied through the fee schedule in regulation 1066)] is a tax, it is invalid. If it is a regulatory fee, it is not . . . ." (*Farm Bureau II,* at p. 437.)

"'[F]ees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes' " are valid regulatory fees. (*Farm Bureau II, supra,* 51 Cal.4th at p. 441, quoting *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 876 (*Sinclair Paint*).) "[T]o determine the tax or fee issue, . . . courts [must] examine the costs of the regulatory activity and determine if there was a reasonable relationship between the fees assessed and the costs of the regulatory activity." (*Farm Bureau II,* at p. 441, citing *Sinclair Paint, supra,* 15 Cal.4th at pp. 870, 878.) "A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. [Citation.] The question of proportionality . . . is measured collectively, considering all rate payors." (*Farm Bureau II, supra,* 51 Cal.4th at p. 438.)

"[A] regulatory fee, to survive as a fee, does not require a precise cost-fee ratio. A regulatory fee is enacted for purposes broader than the privilege to use a service or to obtain a permit. Rather, the regulatory program is for the protection of the health and safety of the public. The legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes. An inherent component of reasonableness in this context is flexibility." (*California Assn, of Professional Scientists v. Department of Fish and Game* (2000) 79 Cal.App.4th 935, 950.)

"The plaintiff challenging a fee bears the burden of proof to establish a prima facie case showing that the fee is invalid." (*Farm Bureau II, supra,* 51 Cal.4th at p. 436.)

16

"[O]nce plaintiffs have made their prima facie case, the state bears the burden of production and must show ' "(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' " (*Id.* at pp. 436-437, quoting *Sinclair Paint, supra,* 15 Cal.4th at p. 878.)

"Whether section 1525 imposes a tax or a fee is a question of law decided upon an independent review of the record." (*Farm Bureau II, supra,* 51 Cal.4th at p. 436.) We review the trial court's foundational factual findings for substantial evidence. (*City of Arcadia v. State Water Resources Control Bd.* (2011) 191 Cal.App.4th 156, 170.)

B.     *The Proceedings on Remand*

In *Farm Bureau II,* our Supreme Court concluded that it could not resolve the " 'tax or fee' question" because the trial court's order lacked sufficient factual findings for it to determine "whether the fees, as imposed, were reasonably proportional to the costs of the regulatory program." (*Farm Bureau II, supra,* 51 Cal.4th at p. 441.) Accordingly, it remanded the matter and directed the trial court "to make detailed findings focusing on the Board's evidentiary showing that the associated costs of the regulatory activity were reasonably related to the fees assessed on the payors." (*Id.* at p. 442.) More particularly, the trial court was instructed to make findings on (1) whether "the fees are reasonably related to the total budgeted cost of the Division's 'activity' (see § 1525, subd. (c))" and (2) whether "the statutory scheme and its implementing regulations provide a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors." (*Ibid.*)

On remand, the trial court determined that plaintiffs did not establish a prima facie case that the fees collected exceeded the total budgeted cost of the Division's operations, while "the Board presented evidence demonstrating that the total amount raised in fees was less than the cost of supporting the Water Rights Division." In doing so, the court

17

observed that plaintiffs "did not focus their challenge on the actual cost of the Division's regulatory activities in comparison to the aggregate amount of fees raised under the regulations. Instead, they focused on the distinct issue of whether the fees were properly apportioned to and among the payors (actual and potential), contending that the fees allocated to payors did not bear a fair and reasonable relationship to those payors' burdens on or benefits from the regulatory activity."

As to that issue, the trial court found that plaintiffs "established a prima facie case that the statutory scheme and its implementing regulations do not 'provide a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors' " by producing evidence that RPP right holders, whose rights accounted for 38 percent of all water rights in the state and who are not charged fees, "receive a benefit from the Division's regulatory activities, and also impose some burden on the agency." The trial court further determined that the Board failed to rebut plaintiffs' prima facie case by producing evidence that showed " 'the estimated costs of the service or regulatory activity [and] the basis for determining the manner in which the costs are apportioned, so that the charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.' " More particularly, the trial court found that "there is no documentary evidence that would support any particular estimate or finding regarding the proportion of the Division's resources that are devoted to water right holders other than the holders of permits and licenses." It also determined that "the Board did not present any evidence that established that funds other than fees paid for regulatory activities related to non-fee paying rights holders," and "absent any evidence that could quantify the amount of such activities as a proportion of the Division's total regulatory activities, it would not be possible to make any such showing."

18

C.    *Analysis*

The salient question is not whether "non-fee paying rights holders," i.e., RPP right holders, received something for nothing, but whether the fees allocated to the affected payors, i.e., permit and license holders, were reasonable and substantially proportionate to all costs related to the regulation of *those payors*. (*Farm Bureau II, supra,* 51 Cal.4th at p. 442.) That RPP right holders were not charged fees but benefited from or placed burdens on the Division's regulatory activities is relevant only if the regulatory costs attributable to RPP right holders necessarily were allocated to the affected fee payors. If other sources of funding, such as the state's general fund, were sufficient to cover the regulatory costs attributable to RPP right holders, it does not matter that RPP right holders were not charged a fee. To the extent the trial court based its determination that plaintiffs established a prima facie case by producing evidence that "holders of water rights that are not charged fees nevertheless receive a benefit from the Division's regulatory activities, and also impose some burden on the agency," it erred.

In any event, the Board presented evidence that at most 10 percent of Division resources were spent on matters involving RPP right holders, and that funding sources other than water right fee revenue more than covered the Division's expenditures on such matters. To support its assertion that the administration of the water right permit and license system constituted the vast majority of the Division's activities, the Board relied on a draft report prepared by consultants for Westlands Water District (Westlands), a plaintiff herein, and correspondence between Victoria Whitney, chief of the Water Rights Division, and Thomas Birmingham, general counsel and general manager of Westlands, concerning that draft report. The draft report states in pertinent part: "An estimate from [Board] staff . . . indicates that the [Board] may spend as much as 10 percent of Division time on riparian and pre-1914 water rights. This time may more appropriately be funded by others or the general fund." Westlands submitted a copy of the draft report to the Board for the purpose of "initiat[ing] discussions about a resolution to the issues that [it]

19

hoped would avoid this litigation."**17** Whitney responded to the report in a letter to Birmingham, stating in relevant part: " . . . Westlands discusses the Division's activities involving riparian and pre-1914 water rights . . . . The report discusses why these activities should be paid by the General Fund. Westlands identified specific percentages of Division time spent on activities. These percentages may be incorrect because they include activities related directly to an existing permit or license." Birmingham replied to Whitney's comments by letter, stating in relevant part: "Our consultants have spent considerable time working with the [Board] and the Division. They provided their best estimate of time the Division spend[s] working on riparian and pre-1914 water right issues. We do believe though that whatever time spent on these issues should not be charged to the water appropriators. *We have provided an educated estimate of 10% of the Division's time is spent on these and related issues*. We recognize that the Division does not keep an account of time spent on these issues, but it would be helpful for the [Board] to submit an estimate for use in our report if you disagree with ours." (Italics added.) Shortly thereafter, Westlands provided the Board with a revised draft report, which states in pertinent part: "Unfortunately the Division does not have an accurate method for determining the amount of time spent on riparian and pre-1914 water rights . . . . However a rough estimate from [Board] staff indicates that the [Board] may spend as much as 10 percent of Division time on riparian and pre-1914 water rights. In addition, our consultants, who have spent considerable time working with the [Board] and the Division, concur with the 10% estimate."

The trial court failed to discuss any of this evidence in its statement of decision. Plaintiffs assert that the trial court rejected the Board's reliance on the draft report

---

**17** Birmingham testified that he thought "the report was in sufficient form and content that we could transmit it to the Water Board to initiate discussions about a resolution to the issues that we hoped would avoid this litigation."

20

because the court "recognized that the Draft Report was not even a 'Westlands' report, accepting Mr. Birmingham's testimony that he and the Westlands Water District actually disagreed with certain aspects of the Draft Report."[18] We need not determine whether the trial court rejected the Board's reliance on the draft report because even assuming for argument's sake that it did, Birmingham, in his capacity as Westland's general counsel and general manager, adopted the consultants' "educated estimate of 10%" in his letter to Whitney. That letter is evidence the Division devoted 10 percent of its resources to RPP right holders. Thus, the trial court's finding that "there is no documentary evidence that would support any particular estimate or finding regarding the proportion of the Division's resources that are devoted to water right holders other than the holders of permits and licenses" is not supported by substantial evidence.[19]

---

[18] Birmingham testified that the first draft report was prepared by outside technical consultants retained by Westlands, and that the views contained therein were those of the individuals who prepared it. During the Board's cross-examination of Birmingham concerning the draft report, the trial court observed: "You're asking [Birmingham] to interpret what somebody else's words mean in a document that's in evidence and the document speaks for itself, and regardless of what you and he think it means, the court will consider what the words in a document in evidence means."

[19] Citing evidence of "Board decisions involving [RPP] water rights," the trial court found that plaintiffs "demonstrate[d] that the Division devotes an unquantified, but clearly non-trivial, proportion of its resources to issues involving those classes of fee-exempt water right holders." The Board disputes the trial court's finding that the decisions involved RPP water rights and argues that 9 of the 11 decisions were outside the relevant time period. We need not address the Board's claims because the trial court's finding that the "Division devotes an unquantified, but clearly non-trivial, proportion of its resources to issues involving . . . [RPP] right holders" is consistent with evidence the Division devotes 10 percent of its resources to RPP right holders. Moreover, the trial court relied on the Board decisions in finding that plaintiffs established a prima facie case that the fees were not properly allocated. At that point, the burden of production shifted to the Board (*Farm Bureau II, supra,* 51 Cal.4th at pp. 436-437), which the Board satisfied in part by producing evidence the Division devotes 10 percent of its resources to RPP right holders.

21

The trial court's reliance on a memorandum Whitney prepared, dated April 7, 2004, entitled "Errata to Memorandum Dated December 29, 2003 Regarding the Water Right Fee Program Summary and Recommended Fee Schedule for Fiscal Year 2003-2004," for the proposition that the Division spends "significantly more than five percent" of its time on resources or activities that benefit RPP right holders, is misplaced. That memorandum states in pertinent part: "In fact, as a portion of the Division's overall administration of water rights, approximately one-third of the Division's time is spent for the purpose of protecting the environment and the public interest and two-thirds of the time is spent on activities that protect prior right holders. Some of the Division's time is spent on efforts to protect parties who claim and appear to have water rights that are not within the [Board]'s permitting authority. Furthermore, once a permit or license is issued, most of staff's efforts are associated with ensuring that the permit or license holder complies with the conditions of the water right permit and with issuing a license to water right permit holders." Whitney's statement that *some* of the Division's time is spent on activities that protect RPP right holders does not suggest that any particular amount of time on such efforts, only that it spends *some* time. To the extent the trial court equated "prior right holders" with RPP right holders, and interpreted Whitney to suggest that the Division spends two-thirds of its time on activities that protect RPP right holders, such an interpretation is unsupported in the record or the law. In the memorandum, Whitney distinguishes between "prior right holders" and "parties who claim and appear to have water rights that are not within the [Board]'s permitting authority," i.e., RPP right holders. Moreover, while the term "prior right holder" may include RPP right holders, it is by no means limited to those right holders. It also may include permit and license holders. (See generally *El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 961-962 [discussing rule of priority].) The memorandum supports a finding that the Division spends some time on efforts to protect RPP right holders, a fact the Board does not dispute.

22

Having found that the Board produced evidence the Division devoted roughly 10 percent of its resources to RPP right holders, we now turn to whether those resources came from the water right fee assessed in fiscal year 2003-2004. To support its assertion that the Division received substantial funding from sources other than the challenged water right fees, the Board relied on the Governor's proposed budget for fiscal year 2003-2004, the final budget act for fiscal year 2003-2004, and related documents. The Governor's proposed budget for fiscal year 2003-2004, which ran from July 1, 2003, through June 30, 2004, and was presented prior to the enactment of Senate Bill 1049, proposed $8.7 million for the water rights program, $7.2 million of which was to come from the state's general fund. Under the final budget act, the program's total appropriation was increased to $9 million, and $4.4 million of that amount was to come from the new Water Rights Fund, thereby reducing the amount payable from the state's general fund. As explained in the final change book to the Governor's fiscal year 2003-2004 budget, "[f]ee revenues would be deposited in the newly created Water Rights Fund and used to offset General Fund expenditure *reductions*." (Italics added.) In fiscal year 2003-2004, the Division's actual costs totaled $9.066 million. Roughly 51 percent of that amount was paid for by water right fees ($4.608 million), 43 percent from the state's general fund ($3.865 million), and the remaining 6 percent from the tobacco tax fund ($355,000), federal trust fund ($150,000), and reimbursements ($88,000). Thus, the water right fee reduced, but did not replace, general fund support for the Division's regulatory activities in fiscal year 2003-2004, and there was more than enough general fund support to cover the costs attributable to RPP right holders.

Plaintiffs dispute the Board's claim that the water right fee accounted for only half of the Division's budget for fiscal year 2003-2004, arguing that "[t]he fees were imposed for the second half of the fiscal year after [Senate Bill] 1049 was enacted." Plaintiffs, however, fail to point to any evidence in support of their argument. Rather, they cite the following statement from the factual and procedural background in *Farm Bureau II*:

23

"The *proposal* called for General Fund support for the first half of the 2003-2004 fiscal year with fee increases covering the second half of the year." (*Farm Bureau II, supra*, 51 Cal.4th at p. 430, fn. 10, italics added.) The statement refers to the LAO's proposal, which recommended "that legislation be enacted that . . . establishes a new annual compliance fee assessed on all water rights holders under the board's jurisdiction, in order to *fully replace* the General Fund support proposed for the board's water rights program." The proposal says nothing about general fund support being used for any part of the year.[20] To the contrary, the proposal recommended reducing general fund support for the water rights program in fiscal year 2003-2004 to zero. Moreover, what the LAO proposed and what the Legislature in fact did are not the same thing. As detailed above, the water right fee did not fully replace general fund support for the Division's regulatory activities in fiscal year 2003-2004.[21]

---

[20] Plaintiffs also cite to a document entitled "Frequently Asked Questions Regarding Water Right Fees," which says nothing about the fees being imposed to support the second half of the fiscal year. Rather, it states in pertinent part: "In an effort to reduce the state's current budget deficit, the Legislature this year decreased General Fund support for the water right program by almost 30 percent. In addition, the Legislature determined that the funding source for almost half the remaining allocation in Fiscal Year 2003-2004 should be shifted from the General Fund to a special fund financed by water right holders." This is consistent with the Board's claim that the water right fee accounted for roughly half of the Division's budget for fiscal year 2003-2004.

[21] The factual and procedural background in *Farm Bureau II* "is largely adopted" from our opinion in *Farm Bureau I* (*Farm Bureau II, supra,* 51 Cal.4th at p. 428, fn. 4), which states that "[t]he LAO proposed that the General Fund support the water rights program for the first half of the fiscal year, and fee increases cover the $ 4.4 million needed for the second half of the fiscal year" (*Farm Bureau I, supra,* 146 Cal.App.4th at p. 1137.) As set forth above, the proposal says nothing about general fund support for any portion of the year. While this court may have assumed such was the case based on the timing of the passage of Senate Bill 1049, evidence presented during the 10-day remand trial establishes otherwise. (At p. 24, *post*.)

In addition, plaintiffs' claim that the fees were imposed for the second half of the fiscal year is at odds with the language of section 1525, subdivision (e), which provides: "Annual fees imposed pursuant to this section for the 2003-04 fiscal year shall be assessed *for the entire 2003-04 fiscal year*." (Italics added.) It is also inconsistent with section 1552, which states in pertinent part that "moneys in the Water Rights Fund are available for expenditure, *upon appropriation* by the Legislature . . . ." (Italics added.) In fiscal year 2003-2004 money in the Water Rights Fund was appropriated and available for expenditure on August 2, 2003, the day the final budget took effect, which was well within the first half of the fiscal year, which ran from July 1, 2003, through June 30, 2004. Thus, while the fee was not assessed until the second half of the fiscal year, the monies appropriated by the Legislature for the Water Rights Fund were available for expenditure in the first half of the fiscal year. At the remand trial, the Board produced evidence showing that Division expenditures were charged against the Water Rights Fund appropriation during the first half of fiscal year 2003-2004, and that as of December 31, 2003, 56.7 percent of that appropriation had been spent. The Board's budget officer explained that it is common for expenses to be paid from a "clearing account" until special fund revenues are received.

Plaintiffs' reliance on statements by the Board to support their assertion that the water right fee was used solely to support the Division's activities in the second half of fiscal year 2003-2004 is misplaced. Whether the water right fee imposed in fiscal year 2003-2004 accounted for all or nearly all of the Division's funding in the second half of the fiscal year is determined by examining the statutory language and evidence related to appropriations and expenditures from the Water Rights Fund, not by the Board's musings.[22]

---

[22]    In any event, none of the statements relied on by plaintiffs explicitly states that the water right fee was in fact used to support the Division's activities in the second half of

Finally, we reject the trial court's finding that the Board failed to consider "proportional allotment in enacting the fee regulations," and that the annual fee is invalid on that basis alone. The record shows that the Board did consider whether the fee represented a fair, reasonably, and substantially proportionate assessment of all costs related to the regulation of affected payors. When the LAO recommended that general fund support for the water rights program be fully replaced with "a new annual compliance fee" assessed permit and license holders, the Board objected on the ground that allocating Division costs entirely to permit and license holders was unfair because permit and license holders would necessarily be paying for costs attributable to RPP right holders, who also benefited from the Division's activities but would not be assessed a fee. As detailed above, general fund support for the water rights program was not fully replaced by the new annual fee in fiscal year 2003-2004. Under the final budget act, the Division's total appropriation was $9 million, only $4.4 million of which was payable from the new Water Rights Fund. The remainder of the Division's funding came primarily from the state's general fund. The trial court appears to have faulted the Board for failing to consider that permit and license holders necessarily would be paying for costs attributable to RPP right holders -- a situation that did not exist. In any event, even assuming for argument's sake that the Board had failed to consider proportionality in developing the fee regulations, that alone would not be a sufficient basis on which to

fiscal year 2003-2004. The statements are as follows: "*In practical effect*, the budget provided general fund support for the first six months of the year, with fee support for the balance of the fiscal year." (Italics added.) "[T]he general funding to support the Division will expire as of December 31st." "In an effort to reduce the state's current budget deficit, the Legislature this year decreased General Fund support for the water right program by almost 30 percent. In addition, the Legislature determined that the funding source for almost half the remaining allocation in Fiscal Year 2003-2004 should be shifted from the General Fund to a special fund financed by water right holders. As a result, the Legislature has directed the [Board] to implement fees to raise revenues of $4.4 million."

26

invalidate the regulations. Plaintiffs must show that they were prejudiced by the Board's action. The Board's adoption of the water right fee regulations involved a quasi-legislative action that is reviewed under the standards of ordinary mandamus. (*Home Builders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 561.) " '[A] party seeking review under traditional mandamus must show the public official or agency invested with discretion acted arbitrarily, capriciously, fraudulently, or without due regard for his rights, *and that the action prejudiced him.*' " (*California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 181, italics added, quoting *Gordon v. Horsley* (2001) 86 Cal.App.4th 336, 351.) Thus, contrary to the trial court's finding, the failure to consider "proportional allotment in enacting the fee regulations" alone is not a basis for invalidating the fee regulations. Plaintiffs must also establish that they were prejudiced by the Board's actions. Because, as detailed above, the water right fee represented a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors, plaintiffs are unable to make such a showing here.

In sum, even assuming that plaintiffs made their prima facie case, the Board satisfied its burden of production by producing evidence that the charges allocated to permit and license holders in fiscal year 2003-2004 did not exceed the cost of the regulatory activities attributable to them. In other words, they were not required to pay for activities attributable to RPP right holders who paid no fees. Accordingly, the trial court erred in concluding that the water right fee imposed in fiscal year 2003-2004 is a tax within the meaning of article XIII A, section 3, of the California Constitution and in invalidating the regulations on that basis.

# II
## The Trial Court Erred in Concluding That Regulation 1073 Violated the Supremacy Clause

The trial court determined that regulation 1073, which allocates the USBR's annual fee for projects within the CVP to the CVP contractors, is unconstitutional under the supremacy clause because the allocation is not limited to the contractors' beneficial or possessory use of the USBR's water rights. The Board contends that because CVP contractors "get all available project water after all legal requirements are satisfied," it fairly and reasonably valued the CVP contractors' beneficial interests in those rights at 100 percent. We agree with the Board.

### A.    *The Applicable Law*

"Under established principles of sovereign immunity, the federal government is immune from state taxation absent its consent." (*Farm Bureau II, supra,* 51 Cal.4th at p. 443.) A state, however, "may, in effect, raise revenues on the basis of property owned by the United States as long as that property is being used by a private citizen or corporation and so long as it is the possession or use by the private citizen that is being taxed." (*United States v. County of Fresno* (1977) 429 U.S. 452, 462 [50 L.Ed.2d 683, 692].) "To successfully defend a supremacy clause challenge to a tax on persons or entities that contract with the federal government, the taxing authority must segregate and tax only the beneficial or possessory interest in the property." (*Farm Bureau II,* at p. 445.) While we concluded above that the annual water right fee is not a tax for purposes of Proposition 13's supermajority requirement, "[w]hen conducting a supremacy clause analysis, federal courts do not distinguish between fees and taxes." (*Farm Bureau II,* at p. 444, fn. 27.)

### B.    *The Proceedings on Remand*

In *Farm Bureau II,* our Supreme Court agreed with the Board "that a fair determination of the [CVP] contractors' beneficial interest must include consideration of the system that supports and ensures the delivery of the amount contracted, not just the

amount of water contracted for delivery." (*Farm Bureau II, supra,* 51 Cal.4th at p. 446.) However, "due to conflicting factual assertions and an inadequate record," the court could not "determine how much of the total water in question is used to support the water delivered and can thus be allocated to the [CVP] contractors' beneficial interest." (*Ibid.*) Accordingly, the court remanded the matter "for the trial court to determine the contractors' beneficial interest and the value of that interest" and "make findings as to whether the Board has fairly evaluated the federal contractors' beneficial interest, such that water not actually under contract for delivery is fairly attributable to the value of the delivery contracts themselves." (*Ibid.*, fn. omitted.)

On remand, the trial court concluded that (1) plaintiffs "established a prima facie case that the fee regulations as applied to [CVP] contractors are invalid because the regulations are not based on a fair evaluation of the contractors' beneficial or possessory interests," and (2) the Board "failed to refute that prima facie case by producing evidence that would permit the Court to determine that the contractors' beneficial or possessory interests, in the aggregate, are equal to [the USBR's] total water rights, and that all water not actually under delivery to contractors is fairly attributable to the value of the delivery contracts themselves." In doing so, the court found that there was "no evidence whatsoever that the Board considered the beneficial interests of contractors, as defined by the Supreme Court, in adopting the fee regulations," and concluded that "[t]he fee regulations must be invalidated on this basis alone." In addition, the trial court dismissed the Board's assertion that all of the USBR's CVP water rights above contract amounts were necessary to deliver water to the contractors as "an attempt at *post hoc* validation of an arbitrary decision," noting that "the complete lack of any evidence that could support an accurate quantification of the contractors' beneficial or possessory interests, reinforces this impression." It also rejected the Board's rationale on the merits, reasoning, "The concept of the [CVP] as an integrated project serving multiple uses, with contractors not in the highest priority, is not really disputed in this case. But accepting this concept

29

really only established that <u>some</u> amount of water not actually under contract <u>may</u> be fairly attributable to the value of the contractors' delivery contracts. It does not necessarily follow that <u>100%</u> of the water not actually under contract <u>should</u> be so attributed." (Fn. omitted.) The court found it significant that the Board had never "done an analysis of the contractors' beneficial or possessory interests in the [USBR's] [CVP] permits," (fn. omitted) finding that without any such analysis, the Board's rationale that all of the USBR's water rights were necessary to support deliveries to contractors "lacks any convincing evidentiary basis." Finally, the court concluded that plaintiffs "presented significant probative and persuasive evidence that the beneficial or possessory interests of the [CVP] contractors could not be valued at 100% of [the USBR's] water rights for the Project" by demonstrating that "the contractors in reality have no actual guaranteed right to delivery of any amount of water, regardless of the face amounts of their contracts, and . . . frequently receive far less water than those face amounts." (Fn. omitted.)

C. *Analysis*

Whether regulation 1073 violates the supremacy clause by allocating the entire annual fee for the USBR's CVP permits and licenses to the CVP contractors turns on whether the Board fairly and reasonably valued the CVP contractors' beneficial interests in the USBR's water rights at 100 percent.

As a preliminary matter, the trial court's finding that there is no evidence the Board considered the contractors' beneficial interests in adopting the fee regulations is not supported by substantial evidence. The Board's decision to limit the fees it passed through to the contractors to those for projects within the CVP (regulation 1073, subd. (b)(2)) shows that it considered the contractors' beneficial interest in the USBR's water rights in adopting the fee regulations. Moreover, at the remand trial, Whitney testified that she considered how much of the USBR's annual fee for projects within the CVP

should be passed through to the contractors and recommended 100 percent.[23] Since her understanding was that the CVP was built as a water supply project, her initial recommendation was that 100 percent of the water right fees that support the CVP should be passed through to the contractors. After receiving comments at workshops that the Board "should not pass through [one] hundred percent of [the USBR's] fees to the CVP contractors," she solicited information from the USBR concerning the CVP's allocated costs "regarding the various uses for which the CVP had been authorized as compared to the uses that [the Board] approved in [its] water rights permits." Ultimately, however, she did not change her recommendation. Both the language of regulation 1073 and Whitney's testimony are evidence the Board considered the contractors' beneficial interests in the USBR's CVP water rights in enacting the fee regulations. The trial court's contrary finding is not supported by substantial evidence. Moreover, even assuming for argument's sake that the Board had failed to take into account the CVP contractors' beneficial interests in adopting the fee regulations, that alone would not warrant invalidating the regulations. As previously discussed, plaintiffs also must establish that they were prejudiced by the Board's actions. (See *California Public Records Research, Inc. v. County of Yolo, supra,* 4 Cal.App.5th at p. 181.) Because, as we shall explain, the Board's decision to allocate all of the USBR's annual fee for projects within the CVP to the water supply contractors was reasonable, plaintiffs are unable to make such a showing.

We now turn to whether the Board fairly and reasonably evaluated the contractors' beneficial interest in the USBR's CVP water rights at 100 percent. An understanding of

---

**23** To the extent plaintiffs claim that the trial court found all of Whitney's testimony lacked credibility, they are mistaken. The trial court found that her testimony that the Division spends approximately five percent of its resources protecting the rights of RPP right holders "lack[ed] credibility or any reasonable foundation" due to the lack of documentary evidence to support it.

31

the history of the CVP, which is well chronicled, is essential to the resolution of this issue.

"The CVP is a federal reclamation project built within the major watersheds of the Sacramento and San Joaquin River systems and the Sacramento-San Joaquin Delta (Delta), providing water storage and distribution to the Central Valley of California. A recent federal opinion noted the following legal and factual background: 'Reclamation projects are indispensible features of agriculture in the Western United States. "The Reclamation Act of 1902 set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States." [Citations.] . . . [¶] The [CVP] is "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure [that] distributes water throughout California's vast Central Valley." [Citation.] The CVP was originally "taken over and executed" by the United States under the Reclamation Act and was reauthorized by the Rivers and Harbors Act of 1937, Pub. L. No. 75-392, 50 Stat. 844, 850 ("the CVP Act"). [Citation.]' (*San Luis Unit Food Producers v. U.S.* (9th Cir. 2013) 709 F.3d 798, 801 (*San Luis Unit*).) The [USBR] is the agency within the United States Department of the Interior charged with administering the CVP. (*Westlands* [*Water District v. U.S.* (9th Cir. 2003)] 337 F.3d [1092,] 1096; *San Luis Unit*, *supra*, at p. 801.)

"As built and operated, the CVP is 'the nation's largest water reclamation project and California's largest water supplier.' (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1154, fn. omitted.) It operates 21 reservoirs, 11 powerplants, and 500 miles of major canals and aqueducts. With total storage capacity of more than 12 million acre-feet, the CVP delivers approximately seven million acre-feet of water annually to over 250 water contractors, primarily for agricultural use in the Central Valley. (*Id.* at p. 1154, fn. 1.) The CVP ' "supplies two hundred water districts, providing water for about thirty million people, irrigating California's most productive agricultural region and generating

32

electricity at [numerous] powerplants." ' (*San Luis & Delta-Mendota Water Authority v. U.S.* (9th Cir. 2012) 672 F.3d 676, 682 (*San Luis & Delta-Mendota*), quoting *Westlands Water Dist. v. U.S. Dept. of Interior* (9th Cir. 2004) 376 F.3d 853, 861.)" (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 840 (*North Coast*).)

"In the original 1937 CVP act, Congress prioritized the purposes of the CVP as ' "first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and, third, for power." ' (*San Luis Unit*, *supra,* 709 F.3d at 801, quoting the 1937 CVP act, § 2.)" (*North Coast*, *supra*, 227 Cal.App.4th at p. 842.)

In 1978, to take account of the combined effects of the CVP and state water project upon the Sacramento-San Joaquin Delta (Delta), the Board modified the USBR's permits to require the USBR to meet new water quality standards in the Delta and Suisun Marsh by either releasing water from storage or curtailing diversions, so that outflow from the Delta would be sufficient to prevent sea water from intruding into the Delta. (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 97-98 (*U.S. v. SWRCB*).) The primary purpose underlying the revised water quality standards *"*was salinity control in order to protect consumptive uses (agricultural, industrial and municipal) of the Delta waters." (*Id.* at p. 115.) As relevant here, the Court of Appeal rejected the USBR's assertion that the Board-imposed conditions for salinity control were inconsistent with congressional directives, holding that river regulation, the first priority stated, includes salinity control. (*Id.* at pp. 135-136.)

"In 1992, Congress passed the Central Valley Project Improvement Act (the CVPIA; Pub.L. No. 102-575 (Oct. 30, 1992) 106 Stat. 4706), which, among other things, amended the original CVP act to reprioritize the objectives of the CVP. The CVPIA elevated the protection of fish and wildlife to one of the main purposes of the CVP, alongside of irrigation and domestic uses, and it reserved 800,000 acre-feet of CVP water for environmental and wildlife protection purposes. (CVPIA, §§ 3406(a) & (b)(2),

33

3404(c); see *In re Bay-Delta etc.*, *supra,* 43 Cal.4th at p. 1154; *San Luis Unit*, *supra*, at pp. 801-802.)" (*North Coast, supra,* 227 Cal.App.4th at p. 842, fn. omitted.) The Central Valley Project Improvement Act (Pub.L. No. 102-575 (Oct. 30, 1992) 106 Stat. 4706; hereafter CVPIA) further required the Secretary of the Interior to provide water to certain wildlife refuges in amounts equal to historical water deliveries to the refuges. (CVPIA, § 3406(d)(1).) These refuges receive between 400,000 and 500,000 acre-feet of CVP water each year. "The CVPIA also expressly required the [USBR] to operate the CVP to 'meet all obligations under state and federal law, including but not limited to the federal Endangered Species Act, [title] 16 [United States Code section] 1531, et seq., and all decisions of the California [Board] establishing conditions on applicable licenses and permits for the project.' (CVPIA, § 3406(b).)" (*North Coast,* at p. 842, fn. omitted..)

"As this regulatory overview confirms, the [USBR] operates the CVP and allocates CVP water subject to a comprehensive scheme of environmental statutes and regulations, including the environmental requirements of the CVPIA, the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.), and various state and federal regulations of Delta waterflow and water quality. (*San Luis & Delta-Mendota, supra,* 672 F.3d at pp. 682-683 [noting the [USBR's] control of the CVP water is subject to a 'plethora of federal statutes and regulations governing' such matters as 'the CVP yield,' 'water quality,' and 'the impact of the releases on the environment and wildlife']; *San Luis Unit, supra,* 709 F.3d at p. 802.)" (*North Coast, supra,* 227 Cal.App.4th at p. 843.)

The USBR operates the CVP under water right permits and licenses issued and regulated by the Board, administers CVP water, and enters into contracts to provide that water to contractors. (*North Coast, supra*, 227 Cal.App.4th at pp. 839, 841; *U.S. v. SWRCB, supra,* 182 Cal.App.3d at pp. 102, 105; § 1391.)

"CVP water is available only through a water service contract between the water user and the [USBR]. There are three categories of contracts for the provision of CVP federal water supply. The first category is comprised of 'Exchange Contracts' that give

express contractual priority to designated 'Exchange Contractors' on the basis of their pre-1914 riparian and appropriative rights to the San Joaquin River. [Citation.] These Exchange Contractors 'traded' their preexisting water rights to the [USBR]. [Citation.] The [USBR] obtained water permits from the [Board] that were co-extensive with the exchanged water rights. The [USBR] in turn entered into water service contracts with the Exchange Contractors for CVP federal water supply on a priority access basis." (*Tehama-Colusa Canal Auth. v. United States DOI* (9th Cir. 2013) 721 F.3d 1086, 1091 (*Tehama-Colusa*).) The cooperation of the exchange contractors made possible the expansion of the CVP and the San Luis Unit. (*Westlands Water Dist. v. United States* (E.D. Cal. 2001) 153 F.Supp.2d 1133, 1146-1147.) In 2004, the exchange contracts totaled roughly 0.84 million acre-feet. The Board did not assess any water right fees on exchange contractors because those contractors had exchanged water to which they were entitled under pre-existing riparian or pre-1914 appropriative water rights for project water.

"The second category of CVP contracts encompasses 'Settlement Contracts' that grant a contractual priority to CVP water supply through the inclusion of provisions limiting the extent of shortage amounts. These contracts typically arose from pre-existing water rights." (*Tehama-Colusa, supra,* 721 F.3d at p. 1091.) The settlement contractors are entities along the Sacramento River that hold pre-existing direct diversion water rights. Prior to Shasta Dam being built, there were high flows in the wintertime and low flows in the summertime. Sometimes the flows were so low that junior rights holders would not be able to divert any water. Once the Shasta Dam was in place and the Sacramento River was regulated, these entities "received a full supply, but [the USBR] knew that some of the water that they were diverting under certain circumstances was there because of the projects." Accordingly, the USBR and these entities negotiated "settlement contracts" pursuant to which the settlement contractors receive a certain amount of "base supply water" annually without any fee, and other "project water" for

35

which they do pay a fee. The base supply water may only be reduced by 25% in critically dry years, and the duty to deliver it is mandatory. (*Id.* at p. 1099.) In 2004, the base supply for the settlement contracts totaled roughly 1.8 million acre-feet. The Board did not assess any water right fees on settlement contractors for base supply water because those contractors held pre-existing rights to divert that water *before* the CVP was constructed; it did, however, assess water right fees for any supplemental entitlement, i.e., project water, under those contracts. (Regulation 1073, subd. (b)(2).)

"The third category contains contracts held by CVP contractors north-of-Delta, in-Delta, and south-of-Delta. This category of CVP contractors . . . held no pre-existing water rights to offer as consideration, and therefore receives no priority access to CVP water supply." (*Tehama-Colusa, supra,* 721 F.3d at p. 1091.) The CVP contractors in this case are members of this third category.

The Board's characterization of the CVP as a "water supply project" was not only reasonable, it was accurate. Water delivery is the *raison d'être* of the CVP. As the cases cited above recognize and the United States Supreme Court explained in *United States v. Gerlach Live Stock Co.* (1950) 339 U.S. 725, 728 [94 L.Ed. 1231, 1237] (*Gerlach*), the Sacramento River has almost twice as much water as the San Joaquin River but the Sacramento Valley has very little tillable soil, while about "three-fifths of the [San Joaquin] valley lies in the domain of the less affluent San Joaquin." "To harness these wasting waters, overcome this perversity of nature and *make water available where it would be of greatest service*, the State of California proposed to re-engineer its natural water distribution. This project was taken over by the United States in 1935 and has since been a federal enterprise." (*Ibid.*, italics added.) "As built and operated, the CVP is 'the nation's largest water reclamation project and California's largest water supplier.' " (*North Coast, supra,* 227 Cal.App.4th at p. 840, quoting *In re Bay-Delta etc., supra,* 43 Cal.4th at p. 1154; see also *Gerlach, supra,* 339 U.S. at p. 728 [describing CVP as "a gigantic undertaking to redistribute the principal fresh-water resources of California"].)

36

That the CVP has other congressionally authorized purposes, some of which Congress has prioritized over irrigation and domestic uses, does not alter CVP's fundamental status as a water supply project. For example, as previously discussed, salinity control is prioritized over irrigation and domestic uses (*U.S. v. SWRCB, supra,* 182 Cal.App.3d at pp. 135-136), yet no one would describe the CVP as a salinity control project. Indeed, the USBR itself recognized this fact in its 2004 CVP operations criteria and plan. While recognizing the various "[a]uthorized project purposes" the USBR acknowledged that "[t]he primary purpose of the CVP was to provide water for irrigation throughout California's Central Valley."

The fact that permit conditions such as those at issue in *U.S. v. SWRCB*, or other obligations imposed on the USBR by the state and federal governments, have reduced the amount of CVP water available for delivery to the CVP contractors does not diminish the contractors' beneficial interest in the CVP permits and licenses. As detailed above, the USBR operates the CVP and allocates CVP water *subject to* a comprehensive scheme of environmental statutes and regulations, and various state and federal regulations. (*North Coast, supra,* 227 Cal.App.4th at p. 843.) The USBR must comply with these statutes and regulations in order to deliver water to the CVP contractors. Stated another way, such compliance is necessary to deliver the CVP contractors their water. Moreover, the CVP contractors take their interest in the USBR's water rights subject to these legal obligations, (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 806, fn. 54), and the USBR cannot give away more than it has. (*Ibid.*) Because the CVP contractors received all available water under the USBR's CVP permits and licenses after meeting its legal obligations, the Board reasonably valued the contractors' interest in those permits and licenses at 100 percent.[24]

---

[24]     To support their claim that the fees assessed on the CVP contractors exceeded their beneficial interest in the CVP permits and licenses, plaintiffs compare the face value

The trial court erred in concluding that the CVP contractors' beneficial interest in the USBR's CVP water rights could not be valued at 100 percent because "the contractors in reality have no actual guaranteed right to delivery of any amount of water, regardless of the face amounts of the contracts, and . . . frequently receive far less water than those face amounts." (Fn. omitted.) The beneficial interest at issue here is in the USBR's water rights, not the water itself. "The issuance of a permit gives [the USBR] the right to take and use water only to the extent and for the purpose allowed in the permit." (§ 1381) The right conferred is the "right to *use* the water -- to divert it from its natural course." (*U.S. v. SWRCB, supra,* 182 Cal.App.3d at p. 100.) The right is usufructuary only and confers no right of private ownership of water in a watercourse.[25] (*People v. Shirokow* (1980) 26 Cal.3d 301, 307; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Personal Property, § 1, p. 15; 12 Witkin, *supra*, Real Property, § 917, pp. 1106-1107.) "Unlike real property rights, usufructuary water rights are limited and uncertain." (*U.S. v. SWRCB*, at p. 104.) That the CVP contractors are not guaranteed any particular amount of water under their contracts with the USBR or frequently receive less water

---

of the CVP permits and licenses (112 million acre-feet) with the face value of the contractors' contracts (6.6 million acre-feet). Such a comparison is misleading because it suggests that CVP has 112 million acre-feet of water available when that is not the case. As detailed above, CVP's total storage capacity is roughly 12 million acre-feet. (*In re Bay-Delta, etc., supra,* 43 Cal.4th at p. 1154, fn. 1; see also *North Coast, supra,* 227 Cal.App.4th at p. 840.) At the remand trial, plaintiffs' expert testified that the annual flow of the Sacramento River is around 20 million acre-feet, and the CVP has 9 million acre-feet of water available for all of its long-term contracts, including refuge, exchange, and settlement contracts. He also testified that "there's a major quantitative difference between the face value of the [USBR's] permits maintained to operate the CVP on the one hand and the amount of water under contract to contractors on the other . . . ." Thus, while it is unclear precisely how much water is available for all CVP purposes, it is nowhere near 112 million acre-feet.

[25]     "Usufructuary" relates to a "usufruct" which is "[a] right to use another's property for a time without damaging or diminishing it . . . ." (Black's Law Dict. (7th ed. 1999) pp. 1542, 1543.)

than the face value of their contracts has no bearing on the extent of their interest in the USBR's permits and licenses, without which they would receive no water at all. As detailed above, the CVP contractors received *all* available water under the USBR's CVP permits and licenses after it satisfied its legal obligations. Because they received everything the USBR had to give under its CVP permits and licenses, the Board reasonably valued the CVP contractors' beneficial interest in those permits and licenses at 100 percent.

In sum, even assuming for argument's sake that plaintiffs established a prima facie case that "the regulations are not based on a fair evaluation of the contractors' beneficial or possessory interests," the Board refuted that prima facie case by establishing that the CVP is a water supply project, and the CVP contractors receive *all* available project water after the USBR satisfies its legal obligations. Accordingly, the trial court erred in concluding that the allocation of fees is not limited to the CVP contractors' beneficial or possessory use of the USBR's water rights, and invalidating regulation 1073 on that basis.

III

The Trial Court Erred in Concluding That the Fee Regulations Are Invalid Because They Operate in an Arbitrary Manner as to One Fee Payor

The trial court also determined that the fee regulations, as applied to Imperial Irrigation District (IID), "operate in an arbitrary and capricious manner as a result of the fact that fees are calculated strictly on the basis of the face amount of water covered by permits and licenses," and are invalid on that basis. The trial court based its determination on the following: ". . . IID obtains water from the Colorado River and transports it though the All-American Canal for eventual delivery to its customers. . . . IID does have a permit from the Board for the water it takes from the Colorado River. It also has six additional permits from the Board for the same water involving its use for hydroelectric power generation at various drop structures along the All-American Canal.

39

The Board charges IID a fee based on the face amount of all seven permits, even though all seven permits involve the same water originally diverted from the Colorado River. . . . [¶] By contrast, . . . the California Department of Water Resources ("DWR"), is treated quite differently with regard to the water rights it holds for operation of the State Water Project. One of those water rights is a permit allowing DWR to divert and store water behind Oroville Dam, release that water from storage, and redivert the same water at 16 separate diversion facilities from Oroville to Perris Dam, in Riverside County. As the water travels southwards, it is used to generate power at nine separate power plants, which is quite similar to what IID does with the water in the All-American Canal. In DWR's case, however, the water is covered by a single permit, instead of seven separate permits as in the case of IID, and DWR is charged a fee only on the face amount of that single permit." (Fns. omitted.)

Lack of uniformity alone is insufficient to establish that a regulatory fee is unreasonable and thus unlawful. (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 197.) Moreover, as set forth above, "A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. [Citation.] The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors." (*Farm Bureau II, supra,* 51 Cal.4th at p. 438.) Thus, assuming without deciding that basing the fee assessment on the face value of the permit and licenses had a disproportionate impact on IID, the trial court erred in invaliding the fee regulations on this basis.

## DISPOSITION

The judgment invaliding the fee regulations is reversed.  The Board is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                /s/
                Blease, Acting P. J.


We concur:


 /s/
Robie, J.


 /s/
Butz, J.